## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DERRICK PALMER, KENDIA MESIDOR, BENITA ROUSE, ALEXANDER ROUSE, BARBARA CHANDLER, and LUIS PELLOT-CHANDLER, <br><br>        Plaintiffs <br><br>   v. <br><br> AMAZON.COM, INC. and AMAZON.COM SERVICES, LLC, <br><br>        Defendants. | COMPLAINT |

## INTRODUCTION

1.      Defendants Amazon.com, Inc. and Amazon.com Services LLC (together, "Amazon") operate the JFK8 "fulfillment center" in Staten Island. The JFK8 facility is a small city that runs twenty-four hours a day, seven days a week and has a footprint of more than fourteen football fields. It employs thousands of workers, many of whom are people of color who travel hours every day by public transportation to work ten- to eleven-hour shifts for low wages fulfilling Amazon orders for customers across the East Coast.

2.      This case is about Amazon's failures to comply with New York law and state and federal public health guidance during the COVID-19 pandemic at the JFK8 facility.

3.      Amazon's failures have already caused injury and death to workers and family members of workers. At least one JFK8 worker has died from COVID-19, and there are rumors of additional deaths among JFK8 workers. Workers have brought the virus home to family members, some of whom have also tragically died.

4.      Plaintiff Barbara Chandler, for example, contracted the virus that causes COVID-19 in March at the JFK8 facility from workers who were explicitly or implicitly

encouraged to continue attending work and prevented from adequately washing their hands or sanitizing their workstations.

5.     Chandler brought the virus home to her family and less than a month later, she awoke to find her cousin with whom she lived dead in their bathroom, after he had become ill with COVID-19 symptoms. As explained further below, Chandler was eligible for and requested paid quarantine leave under New York law, which requires employers like Amazon to promptly issue quarantine pay to workers so that no one feels pressured to attend work when they may be sick. Despite everything she had been through, Amazon failed to pay Chandler her quarantine leave in the next pay period as required. And after weeks of delay, Amazon ultimately compensated Chandler for only a portion of the quarantine leave pay to which she was entitled.

6.     Aside from Chandler's claim to backpay for quarantine leave, Plaintiffs in this case do not seek damages for past harm. All they seek is an order requiring Amazon to comply with public health guidance to prevent more harm in the future.

7.     This harm is not theoretical. Workers at JFK8 continue to contract COVID-19. As recently as this past weekend, JFK8 workers received a message from Amazon announcing "additional" newly confirmed cases in the facility. As New Yorkers consider a gradual return to normalcy, JFK8 workers and their families live with the very real threat of infection every day.

8.     Although Amazon has sought to create a façade of compliance by, for example, providing fulfillment center employees with masks, the company has also relied on purposeful miscommunication with workers, sloppy contact tracing, and the culture of workplace fear it has instilled at JFK8 to ensure it can maintain productivity while reducing costs, even if that means workers come to work sick and cannot engage in proper hygiene, sanitizing, or social distancing while at work in order to stay healthy.

9.      Amazon is not a small business doing its best under uncertain guidance, and Amazon is not helpless to prevent injury and death caused by virus spread occurring within its facility. Amazon is one of the wealthiest companies in the world, and it uses cutting-edge technology to monitor its workers at JFK8, choreographing their locations within the facility by algorithm and using hand-held scanners and smartphone applications to record their movements and track, on a minute-by-minute basis, whether they are working or are "off task."

10.     In an effort to maintain its labor force levels and production, Amazon has exerted iron-fisted control over efforts to stem the spread of the virus among workers at JFK8.  Amazon tells workers they should contact Amazon's onsite clinic if they have symptoms, contact Amazon Human Resources for guidance as to whether they should quarantine, avoid telling others if they become infected and rely on Amazon to perform contact tracing, and continue to work at dizzying speeds, even if doing so prevents them from socially distancing, washing their hands, and sanitizing their work spaces.

11.     Amazon controls its workers and undermines its workers' efforts to protect themselves and their coworkers from the virus that causes COVID-19 through a culture of workplace fear reinforced by constant technological supervision, retaliation against those who speak out, and the threat of automatic and immediate job loss in a job market where it may be impossible to find work elsewhere.

12.     Although Amazon's revenue has ballooned during the pandemic, the company has managed to minimize costs. But the costs Amazon saves are borne by the public, and the risks are most profound for workers and their families, like Plaintiff Barbara Chandler and her cousin. Most New Yorkers have remained safe by complying with the state's stay-at-home order, but for JFK8 workers and their families, home has been a place of danger.

## PARTIES

13.    Plaintiff Derrick Palmer, a resident of New Jersey, is a Warehouse Associate, Process Guide and Picking Master in the Pick, Count, Floor-Health department at JFK8. He has worked for Amazon since July 2015 and has worked in the JFK8 facility since it opened in October 2018. In his role as a Picking Master he picks customer orders, repeatedly touching items that have been touched by other workers at JFK8. His role as a Process Guide requires regular and close interaction with around 40 other warehouse associates.

14.    Plaintiff Kendia Mesidor, a resident of New Jersey, lives with and is in a relationship with Derrick Palmer. She is anemic and at heightened risk of infection. Her potential exposure to the virus through Palmer's work at JFK8 has already caused Mesidor trauma. Mesidor's elderly father died on May 15, 2020; due to her concerns that she could be a carrier of the virus because of living with someone who works at JFK8, Mesidor was only able to see her father once during his final months. Mesidor's last visit with her father took place through a window days before he died.

15.    Plaintiff Benita Rouse, a resident of New York, is a Problem Solver in the inbound department at JFK8. She has worked for Amazon since March 2017 and has worked in the JFK8 facility since it opened in October 2018. In her role as a Problem Solver, she assesses whether damaged items can be re-sold, which entails touching items that have been handled by other workers at JFK8. Her role as a Problem Solver also requires regular and close interaction with her team, as they all use the same equipment and fixtures to process and dispose of products.

16.    Plaintiff Alexander Rouse, a 32-year-old resident of New York, lives with and is the only child of Benita Rouse. During the pandemic, he has followed the stay-at-home order in

4

New York City, only leaving their small apartment about once per week to get groceries. His primary potential exposure to the virus that causes COVID-19 is through his mother, Benita Rouse.

17.     Plaintiff Barbara Chandler, a resident of New York, is a Process Assistant in the Pick, Count, and Floor-Health department at JFK8. She has worked for Amazon since February 2017 and has worked in the JFK8 facility since it opened in October 2018. In her role as a Process Assistant, she helps manage, supervise, and coach a team of about 50 people, frequently interacting closely with workers at JFK8 to ensure they are performing their tasks up to Amazon's standards and to help them solve problems in the workplace.

18.     Chandler tested positive for COVID-19 in March 2020, and several members of her household subsequently became sick, including her cousin who died on April 7, 2020 after experiencing COVID-19 symptoms.

19.     Plaintiff Luis Pellot-Chandler, a resident of New York, lives with and is the oldest child of Barbara Chandler. During the pandemic, he has followed the stay-at-home order in New York City, but after his mother contracted COVID-19, he got sick and experienced symptoms of COVID-19.

20.     Defendant Amazon.com Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.

21.     Defendant Amazon.com Services LLC is a wholly owned subsidiary of Amazon.com Inc.  Amazon.com Services LLC is a Delaware limited liability corporation with its principal place of business in Seattle, Washington.

22.     Amazon is the world's largest internet company by revenue, and, with approximately 840,000 employees, the second-biggest private employer in the United States. Amazon operates the JFK8 facility in Staten Island, New York.

## JURISDICTION

23.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity).

24.     Plaintiffs' claims arise under the laws of the United States because the question of whether Amazon's conduct violates state law involves interpreting federal rules and guidance, including guidance from the Centers for Disease Control and Prevention.

25.     This Court has diversity jurisdiction because Plaintiffs are residents of New York and New Jersey and Defendants are Delaware corporations with their principal places of business in Seattle, Washington.

26.     Furthermore, the cost to Amazon of implementing the injunctive relief requested below, including the costs necessitated by providing prompt information about, and payment of, COVID-19 quarantine leave, providing additional "time off task" to facilitate handwashing and sanitizing of workstations, developing and implementing a plan for disinfecting areas of the facility used by infected workers, and developing and implementing a contact-tracing protocol, is in excess of $75,000.00.

27.     Venue is proper pursuant to 28 U.S.C. § 1391 in the Eastern District of New York because the acts and omissions that are the subject of this action all occurred in the Eastern District of New York.

## FACTUAL ALLEGATIONS

**The Current COVID-19 Pandemic**

28.     COVID-19 is an infectious respiratory disease caused by a novel coronavirus.

29.     COVID-19 can result in serious, long-term health complications and has resulted in over 100,000 reported deaths in the United States to date. Among these serious health complications, COVID-19 can cause inflammation in the lungs, clogging the air sacs in the lungs, limiting the body's oxygen supply and blood clots, organ failure, intestinal damage, heart inflammation, problems with the liver, neurological malfunction, and acute kidney disease.

30.     Some populations are especially vulnerable to the consequences of COVID-19, including individuals 65 years and older, people living in a nursing home or long-term care facility, and others of all ages with underlying medical conditions, such as people with lung disease, asthma, heart conditions, severe obesity, diabetes, kidney disease, or liver disease and people who are immunocompromised.

31.     Some conditions that can cause compromised immunity include cancer treatment, smoking, bone marrow or organ transplantation, immunodeficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids, and other immune weakening medications.

32.     The novel coronavirus that causes COVID-19 is also highly contagious.

33.     COVID-19 appears to spread easily and sustainably across the world through "community spread."

34.     Community spread means that people have been infected with the virus in an area, including some who are not sure how or where they became infected.

35.     The virus spreads mainly person to person, primarily through respiratory droplets produced when an infected person coughs or sneezes.

36.     Spread is more likely when people are in close contact with one another (within about 6 feet for longer than 15 minutes).

37.     The virus can be spread even by people who are "asymptomatic," meaning they carry the active virus in their body but never develop any symptoms; "pre-symptomatic," meaning they have been infected and are incubating the virus but don't yet show symptoms; or very mildly symptomatic, meaning they feel unwell but continuing to come in close contact with others.

38.     Recent research from the CDC suggests that a single person with COVID-19 is likely to infect five or six other individuals absent aggressive social distancing practices.

39.     The best way to prevent illness is to avoid being exposed to this virus.

**New York's Response to the COVID-19 Pandemic**

40.     New York's first confirmed case of COVID-19 was announced on March 1, 2020.

41.     In the following weeks, New York became the global epicenter of the pandemic, with over 380,000 cases and 30,000 deaths to date. Officials estimate there are many more unconfirmed cases of the virus that resulted in many additional deaths.

42.     In addition to illness and death on a massive scale, the New York economy has been hard-hit by the pandemic. At the end of April, an estimated 1.2 million New Yorkers—27 percent of all private-sector workers—were estimated to be jobless.

43.     On March 20, 2020, Governor Andrew Cuomo issued the "New York State On PAUSE" Executive Order ("NYSOP").

44.     Under NYSOP, effective 8:00 p.m. on March 22, 2020, all non-essential businesses in the state were closed. NYSOP permits "Essential Businesses," defined as those

providing products or services that are required to maintain the health, safety, and welfare of the citizens of New York State, to stay open.

45.     Amazon is an "Essential Business."

46.     All Essential Businesses must continue to comply with the guidance and directives for maintaining a clean and safe work environment issued by the New York State Department of Health.

47.     One of the other early steps that New York State took to protect the public was to ensure that essential workers and others had access to paid sick leave when they had to quarantine pursuant to state law because they had contracted or been exposed to the virus and experienced symptoms.

48.     This protection has been an essential feature of New York's public health policy because it ensures that workers, including the millions of essential workers in New York State who do not have the savings to lose the income they make from work, are not encouraged to leave their homes and expose their coworkers by continuing to work.

49.     Under New York's paid quarantine leave protection,[1] workers are guaranteed job protection and financial compensation if they become subject to a mandatory or precautionary order of quarantine or isolation issued by the New York State Department of Health, local board of health, or any government entity duly authorized to issue such order due to COVID-19.

50.     Under New York law, a worker subject to quarantine leave must be paid for quarantine leave in the next pay period so that no one is encouraged to work outside of the home when sick.

---

[1] New Paid Leave for COVID-19, https://paidfamilyleave.ny.gov/COVID19.

51.     In recent weeks, New York has begun a phased reopening of previously closed businesses under the New York Forward plan. As part of this plan, the state has provided detailed industry-specific guidance for businesses that are reopening, as well as those, like Amazon, that were deemed essential and continued their operations during NYSOP. These guidelines are described as "minimum requirements"[2] that businesses must follow to remain open, and include the following:

   a.     Operate at no more than 50-percent occupancy as reflected on the facility's Certificate of Occupancy, except that if more workers are needed to continue safe operations, then additional mitigation measures must be taken;

   b.     Implement policies to minimize sharing of objects and touching of shared surfaces, and when sharing of objects or touching of shared surfaces cannot be avoided, require that workers wash or sanitize their hands before and after use;

   c.     Provide hand washing stations and supplies (including warm water, soap and paper towels) for employee use;

   d.     Stagger shifts and breaks to minimize opportunities for congestion in hallways, break rooms, bathrooms, etc., and stagger scheduled tasks so that multiple teams are not working in the same area at the same time;

---

[2] Interim Guidance for the Wholesale Trade Sector During the COVID-19, https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/WholesaleTradeMasterGuidance.pdf.

e.     Ensure that workstations are cleaned and sanitized between shifts and that shared tools and equipment are cleaned and sanitized before a different worker uses them;

f.     If a person working on site tests positive for COVID-19, disinfect all portions of the facility to which that person had access, waiting 24 hours where possible to begin the disinfection process and closing those parts of the facility undergoing disinfection until the process is complete;

g.     Conduct regular, ongoing cleaning of the entire facility, giving particular attention to frequently touched surfaces and high-risk areas where many workers are present, and keep a log of all cleaning activities;

h.     If cleaning products are provided to workers to clean their own workstations, allocate time during shifts for this cleaning to be conducted;

i.     Conduct health screenings of all people entering the facility including asking if they have experienced symptoms of COVID-19 or been in contact with someone who has tested positive for the disease in the past 14 days, and keep a log of all responses to these questions to facilitate contact tracing efforts;

j.     Cooperate with local health departments if someone at the facility is diagnosed with COVID-19 by providing a list of all workers and visitors who entered the facility within 48 hours of the time the infected person was diagnosed or began experiencing symptoms, whichever was earlier.

**The Centers for Disease Control Response to the COVID-19 Pandemic**

52.     In response to the COVID-19 crisis, the CDC published guidance for employers and employees, including Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19).

53.     The purpose of the guidance is to "help prevent workplace exposures to COVID-19, in non-healthcare settings" and to "provide[] planning considerations for community spread of COVID-19." *Id.*

54.     The following is a summary of some of these guidelines:

a.     Employees who have symptoms should stay home and employers should develop flexible leave policies to allow employees to stay home, particularly by creating non-punitive sick leave policies;

b.     Employers should not require a positive COVID-19 test or a healthcare provider's note for employees to take sick leave;

c.     Sick employees should not return to work except in consultation with independent health care providers and state and local health departments;

d.     Employers should reduce face-to-face contact between employees;

e.     Employers should take steps to reduce transmission at the workplace by reassigning work tasks to maintain social distance of six-feet, staggering shifts, or allowing telework;

f.     Employers should establish policies to minimize spread through a workplace by identifying workers who have likely been exposed to the disease, including in some cases through contact tracing that requires a review of close contacts over the 48 hours before symptoms of the disease emerged;

g.     Employees should be encouraged to wash their hands and employers should facilitate this by providing hand washing stations;

h.     Employers should provide tissues;

i.     Employers should increase ventilation rates; and

j.     Employers should develop plans to clean high touch areas with an EPA-approved cleaning agent.

**Amazon Fails to Follow Minimum Public Health Standards to Prevent Transmission of COVID-19 at JFK8**

55.     During NYSOP, Amazon has kept JFK8 open as an essential business.

56.     JFK8 is a building that occupies approximately 840,000 square feet and is located in the Bloomfield neighborhood on the west shore of Staten Island.

57.     On average there are approximately 3,500 workers at JFK8. During peak seasons, which include months leading up to Christmas and the time around Amazon Prime Day in July, the workforce swells to approximately 5,000 workers.

58.     The workforce at Amazon has similarly swelled during the COVID-19 pandemic. Amazon has said it hired 175,000 new workers in April.

59.     At JFK8, many of the new workers are temporary workers hired to meet increased demands during the pandemic.

60.     Full-time JFK8 workers typically work 10.5-hour or 10.75-hour shifts, four days per week.

61.     During peak seasons these workers are expected to work "mandatory extra time" shifts, or "MET," of an additional 10-hour shift each week.

62.     Amazon has required some workers to work "mandatory extra time" because of increased demands during the pandemic.

63.     For example, on March 18, 2020 Amazon sent a text message to workers at JFK8 with a "reminder that All departments will be on MET For the week of March 22nd" and encouraged workers to come in to work because customers were relying on them more than ever.

64.     JFK8 also employs part-time workers who typically work 10-hour shifts, 3 days per week as well as flex-shift workers and variable-shift workers who have individualized schedules based on their availability.

65.     Because of JFK8's somewhat remote location, many workers take multiple forms of public transit to get to work. Those workers who do not have their own cars typically take public transit in New York City to the Staten Island Ferry and then board a city bus, the S40 or the S90, from the St. George Terminal to the facility.

66.     Although the S40 and S90 are used by JFK8 workers, they are public busses and other city residents can and do use them frequently.

67.     Because of the pandemic, the S90 express route has been suspended and service on the S40 has been significantly reduced.

68.     JFK8 workers and other City residents crowd onto the S40, often filling busses to capacity and leaving passengers to wait for the next bus.

69.     As a result, JFK8 workers who rely on public transit must often wait longer than usual for the bus and may arrive late to the facility.

70.     Around March 24, 2020, workers at JFK8 began raising concerns about Amazon's failure to take steps to ensure their safety.

71.     Specifically, workers were concerned that management was withholding information about positive cases in the facility, refusing to shut down the facility for a deep sanitization as had been done in other Amazon facilities with positive cases, failing to implement

and enforce policies to allow for adequate social distancing, and failing to improve access to leave for workers who were sick, who had family members who were sick, or who believed they had been exposed to someone with COVID-19.

72.    Amazon has disciplined several workers who spoke out about health and safety concerns at JFK8, including Plaintiff Derrick Palmer.

73.    Upon information and belief, as of June 2, 2020, there have been at least 44 confirmed cases of COVID-19 at JFK8.

74.    Upon information and belief, as of June 2, 2020, at least one, and possibly more, JFK8 workers have died of COVID-19-related causes.

75.    As of June 2, 2020, at least 4 family members or others who share living space with JFK8 workers have become infected with COVID-19, including three children and one cousin of Plaintiff Barbara Chandler. At least one of these individuals died.

**Amazon Discourages Workers from Taking Quarantine Leave and Does Not Promptly Pay Workers for Quarantine Leave as Required by New York Law**

76.    New York State law is abundantly clear: paid sick leave for workers is essential to preserve the public health during this pandemic.

77.    If workers feel pressure, whether explicit pressure from their employers or implicit economic pressure, to continue coming to work even when they may have the virus that causes COVID-19, the public health will suffer.

78.    Clearly communicating with workers about access to leave, promptly providing them with that leave, and promptly paying them for that leave is essential to protect the public health.

79.     Although Amazon purports to comply with New York quarantine leave law, it fails to abide by either the letter or the spirit of that law by obfuscating and miscommunicating with workers regarding the availability of leave.

80.     Amazon also fails to promptly pay workers when they stay home from work consistent with New York quarantine leave laws.

81.     Access to prompt, full payment for quarantine leave is essential to ensuring that workers can, consistent with the purposes of New York law, remain safely at home if they are or may be sick, confident that their income will not suffer as a result. That is a public health imperative.

82.     The potential availability of other forms of leave for Amazon workers does not absolve Amazon of its responsibility to make quarantine leave easily accessible.

83.     Many categories of paid and unpaid leave at Amazon are only accessible to workers who have formally applied to Amazon for such leave.

84.     Leave made available to workers at the employer's discretion is insufficient to mitigate the public health consequences of not providing adequate leave, particularly for low-wage workers in workplaces where workers fear retaliation for seeking leave.

85.     Some JFK8 workers may be entitled to some amount of automatic unpaid leave or "UPT," which accrues at 20 hours per quarter.

86.     Amazon deducts a full hour of UPT each time a JFK8 worker is more than five minutes late to work.

87.     This is true even if their lateness is due to public transportation problems, which have frequently occurred due to limited public transit during the pandemic.

88.     Furthermore, once a worker loses all his or her accrued UPT, he or she can be automatically fired for arriving late to work, even by a minute.

89.     The critical importance of UPT, and the potential consequences of running out of it, mean that workers fear running out of UPT for matters that cannot be controlled, like public transportation delays.

90.     As a result, workers are fearful of using up their UPT and guard it closely.

91.     Due to the COVID-19 pandemic, Amazon provided JFK8 workers with unlimited UPT for a period of time that included part of March and all of April 2020.

92.     Amazon recognized that this policy was essential to ensuring workers would feel safe staying home from work when they were sick.

93.     In May 2020, Amazon reinstated its usual limits on UPT.

94.     Since then, workers have struggled once again to retain their UPT and therefore feel increased pressure to attend work while sick or when they believe they were exposed to a COVID-19 positive individual.

95.     Because of the risks of unemployment, especially now, when the unemployment rate is higher than at any time since the 1930s, Amazon's unpaid leave policy is insufficient to reassure workers that they can miss work because of illness or exposure to illness.

96.      Workers at the JFK8 facility are also entitled to up to 48 hours of paid leave over the course of a year (called Paid Time Off or "PTO"), but which accrues at a gradual rate of one hour for every thirty hours of work in accordance with New York City paid sick leave laws.

97.     The amount of paid leave JFK8 workers are entitled to is inadequate to encourage workers to take sufficient leave when they are experiencing symptoms of COVID-19 or have

been exposed to the virus that causes COVID-19, particularly because of how slowly it accrues and the fact that many of Amazon's newer workers have access to little or no PTO.

98.     Amazon's punitive policies regarding unpaid leave further exacerbate the problem of the amount of paid leave being inadequate. Workers hesitate to use their city-mandated paid sick leave when they are sick because they are fearful that they may need to use it if, for example, they are late for work and unpaid leave is not available or during "blackout" periods when they are not entitled to use discretionary leave time.

99.     Amazon's unwillingness to provide easily accessible leave for workers who believe they may be infected with COVID-19 encourages workers to come to work when they are sick, exacerbating spread of the virus in the facility and beyond.

100.    Moreover, when a worker at JFK8 reports to a supervisor that he or she may be experiencing symptoms of COVID-19, the supervisor urges that worker to contact "Amcare," Amazon's in-house clinic.

101.    Amcare purports to provide medical care to Amazon workers experiencing injury or illness.

102.    Amcare has come under considerable scrutiny for purporting to provide medical care without being licensed to do so.

103.    As recently as 2019, Amazon received a "hazard letter" from the Occupational Health and Safety Administration regarding a nearby fulfillment center's Amcare facility, which also purported to provide medical care but did not receive sufficient oversight or supervision from a licensed physician.

104.    Amcare has encouraged workers to return to work notwithstanding the presence of injuries or illnesses that Amcare is not licensed to treat.

105.     Some workers have asked Amcare about COVID-19 and possible exposure at the facility, and Amcare has told them not to worry.

106.     On at least one occasion, a worker attempted to continue working after having visited Amcare and complaining of symptoms.

107.     When workers at the JFK8 facility appear to have symptoms of COVID-19 or believe they have come into close contact with the virus, Amazon requires them to communicate with Amazon's human resources team before they stay home pursuant to New York's quarantine laws.

108.     Because of Amazon's byzantine protocols related to quarantine leave and its retaliation against workers who speak out about workplace safety and COVID-19, many Amazon workers are confused about the process and fearful about what will happen if they pursue quarantine leave.

109.     Even when workers do affirmatively seek out information from Amazon about whether they should quarantine and whether they will be able to access paid quarantine leave, Amazon is slow to respond, causing workers to attend work even when they may be sick.

110.     For example, in May 2020, Plaintiff Benita Rouse heard from a co-worker with whom she had close contact at work for several days that he had tested positive for COVID-19.

111.     Rouse was concerned by her close contact with someone who had the virus but did not believe she could access quarantine leave without first speaking to Amazon's human resources department.

112.     Other leave available to Rouse, including unpaid leave, is dwindling, and she was fearful of using it knowing that she would likely need it someday to avoid discipline by Amazon.

113.     The day after learning of their co-worker's diagnosis, Rouse and another co-worker who had also been in close contact with the COVID-19 positive individual attended work and spoke to someone in Amazon's human resources office.

114.     The human resources employee told Rouse to go home and said that the human resources employee could not make the decision herself but that someone who "gets paid more" than her would call Rouse about whether she could access quarantine leave under New York law.

115.     Rouse did not receive a follow-up call to inform her whether to go to work.

116.     Fearing they would be terminated if they failed to show up for work but also not wanting to further spread the virus in a workplace that had already lost workers to COVID-19, Rouse and her co-worker repeatedly called Amazon human resources in an attempt to find some clarity.

117.     Ultimately, for fear of being disciplined, Rouse's coworker attended work without a definitive answer from Amazon.

118.     When Rouse finally reached a friend's day shift manager via "Chime," Amazon's in-house messaging system, she was told that she should be patient because "contact tracing takes some time."

119.     Then, five minutes later, the manager told Rouse that she could return to work that day.  A few hours later, the same manager asked Rouse to inform her co-worker that they could return to work.

120.     No one from Amazon asked Rouse if she had experienced any symptoms of COVID-19 before authorizing her to return to work.

121.    Even when Amazon workers unquestionably qualify for paid quarantine leave and decide not to attend work, Amazon makes it difficult for them to obtain their state-required paid leave for their quarantine.

122.    When Barbara Chandler was worried that she might have contracted COVID-19 at the facility, she was fearful of missing work and of using precious time off. Chandler ultimately used some of her available unpaid time ("UPT") to take time off work.

123.    Days later, Chandler learned over the phone that she had tested positive for the virus after calling the clinic where she was tested a few days earlier.

124.    Chandler promptly sent Chime messages to human resources staff letting them know about her positive test.

125.    Shortly thereafter, Chandler received a phone call from an Amazon supervisor requesting that she provide proof of the positive test before he would "escalate" the matter to Amazon HR for the purposes of providing her with quarantine leave pay.

126.    As soon as Chandler was able to receive proof of her positive test later that evening, she sent it via Chime to the Amazon supervisor.

127.    As part of the purported process of receiving quarantine pay, Amazon's Employee Resource Center ("ERC") completed leave documents with Chandler by phone, and she received a "decision notification" from ERC several days later that authorized her leave under Federal FMLA, Amazon's Medical Leave of Absence, and Amazon's Short Term Disability policies.

128.    Amazon did not inform Chandler that she qualified for New York's COVID-19 paid sick leave, under which she was entitled to full pay during her quarantine.

129.    As of June 2, 2020, Barbara Chandler has only received 56 hours of full pay for her more than two weeks of quarantine, even though those benefits are supposed to be paid out to workers in the next pay period.

130.    Amazon paid part of the remainder of Chandler's COVID-19 quarantine pay as "Short Term Disability" at 60 percent her regular rate.

**Amazon Prevents Workers from Engaging in Basic Hygiene Tasks and Social Distancing**

131.    Amazon uses real-time tracking of employee activity on scanner devices that workers use to scan items, bins, and packages, in order to track whether workers at JFK8 are "on task" or "off task" for every minute of work.

132.    During every minute of each shift, including the two paid rest breaks, Amazon tracks—down to the minute—whether the worker is actively engaged in work based on whether they perform a task in that minute and aggregates a total time off task ("TOT") for each worker every day.

133.    If a worker has more than 30 total minutes of TOT in a shift, other than their paid break time, they receive a written warning.

134.    If a worker has more than 60 total minutes of TOT in a shift, other than their paid break time, they receive a final written warning.

135.    If a worker reaches 120 minutes of TOT in a shift, other than their paid break time, Amazon automatically terminates them.

136.    Although supervisors are authorized to re-code TOT for certain activities (like visiting Amcare) so that it does not count against the worker, supervisors cannot waive TOT for bathroom breaks, including trips to the bathroom for handwashing purposes.

137.   In addition, Amazon monitors workers to assess whether they are scanning items quickly enough.

138.   Typically, Amazon expects workers at JFK8 in the pick department to pick a total of 400 items per hour.

139.   In the count department, workers are expected to count 750 items per hour in simple bin count, 320 items per hour in simple record count, and 175 items per hour in cycle count.

140.   Workers who are not able to maintain Amazon's set rates are given verbal warnings and workers who consistently underperform compared to Amazon's rates are disciplined with write-ups or termination.

141.   Amazon does not automatically provide its warehouse workers with real-time information about how much TOT they have accrued over the course of their shift or about how fast they are picking or counting items.

142.   Many workers learn about their TOT or rate only when they are subject to discipline for not working fast enough or taking too much time away from their workstations.

143.   Therefore, these workers are unaware of how close they may be to hitting a TOT or rate-based disciplinary benchmark.

144.   Because of these time pressures and the absence of information about pace of work and TOT, Amazon warehouse workers are forced to work at a frenzied pace.

145.   Amazon's TOT and rate policies are oppressive and dangerous, even absent a pandemic.

146.    Based on a sample of records from Amazon facilities around the country, the National Employment Law Project and a coalition of workers' rights organizations determined that the Total Recordable Injury Rate at Amazon facilities in 2018 was 10.76 per 100 workers.

147.    This is three times as high as the injury rate across all private employers (2.8 recordable injuries per 100 workers) and more than twice as high as the injury rate in the notoriously hazardous general warehousing industry (5.2 recordable injuries per 100 workers).

148.    The National Council for Occupational Safety and Health (NCOSH) included Amazon on its "dirty dozen" list of especially unsafe workplaces in 2019. NCOSH reported that Amazon workers "labor at a relentless pace, with constant monitoring of their activities. This high stress environment leads to physical and emotional ailments—but reports indicate that the company does not provide adequate support to those suffering on-the-job injuries."

149.    In the context of the COVID-19 pandemic, the relentless pace of work at Amazon facilities becomes even more dangerous because the TOT and rate policies discourage workers from leaving their workstations to wash their hands and from taking the time to wipe down their workstations.

150.    This is particularly true because of the size of JFK8. A bathroom or handwashing station can easily be a 7-minute walk, each way, from a worker's workstation.

151.    Although Amazon has provided some additional hand sanitizing stations for workers, there are insufficient handwashing supplies or facilities near workstations.

152.    For most workers, however, the only place that they can wash their hands is the bathroom, which could mean 15 minutes or more of TOT and a significant decrease in their rate.

153.    If the bathroom is already occupied when a worker arrives, waiting longer for the bathroom to be vacated, as social distancing guidelines recommend, results in even more TOT and a further decrease in their rate.

154.    Even when Amazon provides wipes to clean workstations, some workers, including the Plaintiffs employed by Amazon, fear taking the time to clean their stations for fear it will result in a writeup for TOT or rate issues.

155.    Amazon has not provided workers with additional time between breaks to wash their hands or clean their workstations while they are working.

156.    In fact, Process Assistants, who have the authority to waive TOT for certain reasons, are not allowed to waive TOT for bathroom trips, even if workers are trying to wash their hands to protect themselves from the spread of COVID-19 in the facility.

157.    The rush to avoid TOT and maintain Amazon's rates while working also impedes social distancing.

158.    Workers often find themselves rushing through the facility, which makes it difficult for them to spread out in hallways or, when they are able to use the bathroom or are required to access other cramped spaces, to allow other workers to leave before they enter.

159.    These time constraints exert particularly harsh pressures over workers now because Amazon has hired a substantial number of temporary "seasonal" workers to staff its JFK8 warehouse during the pandemic.

160.    These temporary "seasonal" workers, many of whom have been laid off from other jobs, are helping Amazon to meet increased demands cheaply and filling in for dozens of workers who have contracted COVID-19 while working at Amazon or who are in quarantine as a result of exposure to coworkers who have contracted COVID-19.

161.    These temporary "seasonal" workers have even less familiarity with Amazon requirements regarding TOT and rate but are just as fearful of losing their jobs.

162.    These temporary "seasonal" workers are thus more likely to rush through tasks and when moving through the facility and less likely to take even modest time away from their work to wash their hands.

**Amazon Takes Responsibility for Contact Tracing, But Fails to Comply with the Basic Requirements of Contact Tracing**

163.    Amazon informs workers that it engages in contact tracing.

164.    Amazon even suggests that its own contact tracing—as opposed to the judgment of the local public health offices—should determine whether a worker is eligible for quarantine leave.

165.    Amazon purports to perform contact tracing through and with the aid of its immense surveillance system, which uses cameras and other technology to track workers' locations during workdays.

166.    Amazon has told workers that its contact tracing consists entirely of reviewing surveillance footage to monitor the workplace contacts of workers diagnosed with COVID-19.

167.    Amazon claims it uses this information—and only this information—to identify workers who came into close contact with an infected worker during the final shift that the worker was in the facility before leaving due to infection.

168.    Amazon does not interview infected workers to identify colleagues they believe may have been exposed to the virus at JFK8.

169.    Amazon discourages workers who have tested positive for COVID-19 from informing coworkers they have tested positive and that others may be at risk.

170.     These practices fall short of, and in some cases are directly contrary to, proper protocols for contact tracing.

171.     According to CDC guidance, the entity performing contact tracing should inform all people who have come into close contact with an infected person within the 48 hours before the infected person experienced symptoms.

172.     According to New York requirements, employers must cooperate with local health departments if someone at the facility is diagnosed with COVID-19 by providing a list of all workers and visitors who entered the facility within 48 hours of the time the infected person was diagnosed or began experiencing symptoms, whichever was earlier, so that proper contact tracing can be performed.

173.     Instead of cooperating fully with local health authorities, however, Amazon appears to be attempting to perform contact tracing on its own.

174.     A health advisory published by the New York State Health Department on March 31, 2020, mandated that essential workers who had been exposed to a person with a confirmed or suspected case of COVID-19 would only be permitted to continue working if they remained asymptomatic, quarantined while at home, underwent symptom checks upon entering the workplace each day, and self-monitored for symptoms (including checking their temperature every 12 hours) while at home.[3]

175.     Amazon does not ask workers who have reported exposure to an individual with COVID-19 whether they have any symptoms.

_____

[3]

https://coronavirus.health.ny.gov/system/files/documents/2020/04/doh_covid19_essentialperson nelreturntowork_rev2_033120.pdf.

176.     Amazon also does not instruct these workers on how to monitor their health at home, to quarantine when not at work, or to seek medical advice.

177.     In an effort to maintain labor force levels, even when many workers are or may be infected with COVID-19, Amazon is not performing contact tracing consistently with CDC and/or New York State guidance.

**Amazon Does Not Properly Sanitize High-Touch Services or Clean Areas that Have Been Touched by Someone Who Has Been Diagnosed with the Virus**

178.     Sanitizing and cleaning are especially important in a facility like JFK8, where thousands of workers may be touching the same surfaces on any given day and where many workers have already contracted COVID-19.

179.     The CDC currently recommends that businesses routinely disinfect all surfaces.

180.     For surfaces that have been touched by someone who has contracted COVID-19, the CDC recommends that businesses prevent others from touching those surfaces for at least 24 hours before thoroughly disinfecting the surfaces with an EPA-approved disinfecting agent.

181.     Amazon sometimes provides workers at the JFK8 facility with access to tissues and disinfectant but does not provide those workers with extra time to clean surfaces.

182.     Because of their strict work-pace requirements, which have not been adjusted during the pandemic, workers do not have sufficient time to clean their own workspaces.

183.     Amazon does not provide a consistent or reliable supply of hand sanitizer or disinfecting wipes. Workers at the JFK8 facility have at times even resorted to searching the area where damaged products are stored to try to find cleaning supplies.

184.     Additionally, although dozens of workers at the facility have already contracted COVID-19, Amazon has not prevented other workers from touching any surfaces touched by

someone who has contracted the virus within the prior 24 hours and has not made efforts to adequately sanitize those surfaces.

## COUNT I: PUBLIC NUISANCE AND DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

### (BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)

185.    Amazon's failure to comply with minimum basic health and safety standards at the JFK8 facility, including the CDC guidelines and other minimum public health standards necessary to stop the spread of COVID-19, is causing, or is reasonably certain to cause, community spread of the disease.

186.    This community spread is not, has not been, and will not be limited to JFK8. Infected workers will go home to interact with their families and with other members of the public as they undertake their day-to-day activities, like grocery shopping and using public transportation.

187.    Increased community spread at JFK8 will cause increased community spread within the five boroughs of New York City, the State of New York, the State of New Jersey, and potentially other states as well.

188.    This community spread will result in disease and possibly death. It will also stress healthcare resources and cause financial harm.

189.    Amazon's current policies and practices constitute a public nuisance because they unreasonably interfere with the common public right to public health.

190.    This public nuisance causes special harm to Plaintiffs Chandler, Palmer and Benita Rouse (the "Employee Plaintiffs") because they are directly exposed to the dangerous working conditions at JFK8 caused by Amazon's policies and failures to meet its minimum duties to its employees.

191.    The Employee Plaintiffs also experience special harm flowing from their fear of contracting COVID-19 and infecting a family member. The Employee Plaintiffs experience emotional distress flowing from their knowledge that their work—which they cannot do remotely and which they need to sustain their families—may expose their loved ones to a deadly virus.

192.    This public nuisance causes special harm to Plaintiffs Pellott-Chandler, Mesidor and Alexander Rouse (the "Family Plaintiffs") because sharing homes with the Employee Plaintiffs heightens their risk of contracting the virus and creates a different kind of risk than the public generally experiences because the Family Plaintiffs are at substantial risk of contracting COVID-19 even if they remain at home and comply with all social distancing and other public health directives.

193.    This risk is different in degree and kind from the public generally. Whereas the public generally can protect themselves from the virus by staying home, the Family Plaintiffs are at risk inside their own homes because of the exposure Amazon causes to Employee Plaintiffs.

194.    Amazon's public nuisance also causes special harm to the Family Plaintiffs because they experience anxiety about contracting COVID-19 as a result of their family members' work at JFK8.

195.    Plaintiffs therefore request a declaration that Amazon's policies and practices at JFK8 constitute a public nuisance and request injunctive relief to abate the nuisance.

**COUNT II:** **BREACH OF DUTY TO PROTECT HEALTH AND SAFETY OF EMPLOYEES AS REQUIRED BY NEW YORK LABOR LAW § 200 AND DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201**

**(BY EMPLOYEE PLAINTIFFS AGAINST ALL DEFENDANTS)**

196.     Pursuant to New York Labor Law § 200, Amazon must provide reasonable and adequate protection to the lives, health, and safety of all persons employed at or lawfully frequenting JFK8.

197.     By failing to adopt and adhere to policies designed to protect the health and safety of its workforce during the COVID-19 crisis, Amazon breached this duty.

198.     Employee Plaintiffs and other workers at JFK8 have already been harmed as a result of this breach, including emotional harm and in some cases pecuniary harm and physical harm associated with the COVID-19 infection.

199.     The Employee Plaintiffs are also likely to experience future harm if Amazon does not immediately satisfy its duty to protect employees' health and safety as a matter of New York law.

200.     The Employee Plaintiffs request a declaration that these workplace safety duties are being breached and request injunctive relief to ameliorate the breach.

**COUNT III:  FAILURE TO TIMELY PAY EARNED WAGES UNDER N.Y. LAB. LAW § 191**
**(PLAINTIFF BARBARA CHANDLER AGAINST ALL DEFENDANTS)**

201.     Plaintiff Chandler is an employee of Defendants.

202.     Defendants employ Chandler.

203.     Chandler is engaged in manual labor pursuant to N.Y. Lab. Law § 191.

204.     Pursuant to New York law, COVID-19 quarantine leave pay is earned wages that must be paid out as wages during the next pay period.

205.    Defendants failed to pay Chandler her earned wages for COVID-19 quarantine leave on a timely basis.

## PLAINTIFFS DO NOT DEMAND A JURY TRIAL

## PRAYER FOR RELIEF

206.    Plaintiffs respectfully request an Order from this Court:

a. Entering judgment for Plaintiffs and against Defendants;

b. Declaring that Amazon's failure to implement appropriate worker protections during the COVID-19 crisis constitutes a public nuisance under New York law and a violation of the right to a safe workplace under New York law.

c. Entering preliminary and final injunctive relief to protect the workers and community from transmission, including but not limited to:

    i. Communicate clearly with workers that if they are experiencing symptoms of COVID-19 or otherwise may be subject to a quarantine they should consult a physician or public health professional and not attend work, that they will not face any adverse employment consequences for taking quarantine leave, and that they will be paid on their next paycheck for taking quarantine leave;

    ii. Pay workers for quarantine leave on their next paycheck;

    iii. Cease the policy of "docking" workers' Unpaid Time Off ("UPT") balances as a disciplinary sanction, so that if a worker is more than five minutes late, they will lose only those minutes of UPT from their accumulated total, not a full hour;

iv.   Excuse tardiness related to MTA reductions in service from UPT deductions so that workers will not be penalized for public transportation-related delays;

v.    Allow an extra 20 hours of UPT per quarter for the remainder of 2020;

vi.   Consistent with CDC guidance, allow workers immediate access to all 48 hours of PTO, even if they have not yet accrued all 48 hours based on their amount of time working at Amazon, for the remainder of 2020;

vii.  Communicate these leave policies clearly to all workers, including on internet sites that workers can access when not at the facility, and emphasize that there will be no adverse job consequences for taking such leave;

viii. Communicate to workers in multiple modalities that if they have concerns about experiencing COVID-19 symptoms, they should consult a doctor or public health official, not Amcare;

ix.   Grant an additional 30 minutes of Time Off Task ("TOT") per day without penalty to allow workers sufficient time to wash their hands and sanitize their workstations;

x.    Provide real-time information to workers about TOT and their rate in any given shift;

xi.   Implement policies for closing off sections of the facility, or the entire facility if necessary, to allow for disinfection of areas exposed to an infected individual in accordance with NYS and CDC guidance; and

xii.    Either a) delegate all contact tracing responsibilities to the local health department or another independent, trained professional without relying on its own surveillance footage to determine which workers have been in contact with one another or, if Amazon continues to perform contact tracing itself, then b) conform those efforts to CDC guidance for contact tracing, such as interviewing the infected individual about others they have been in touch with, accounting for their activities in the 48 hours before diagnosis or onset of symptoms, and following up with all identified contacts of the infected individual to inform them of their exposure and inquire if they are experiencing symptoms.

d.   Damages including compensatory damages, statutory penalties, and other available relief for Plaintiff Barbara Chandler arising from unpaid wages and late payment of wages arising from failure to pay New York quarantine leave in a prompt manner.

Dated: June 3, 2020
New York, NY

By: /s/ Juno Turner

Juno Turner
David H. Seligman*
Valerie Collins*
Towards Justice
1410 High Street, Suite 300
Denver, CO 80218
Tel: (720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
valerie@towardsjustice.org

Sienna Fontaine
Elizabeth Jordan
Frank Rankin Kearl*
Make the Road New York
92-10 Roosevelt Avenue
Jackson Heights, NY 11372
Tel: (718) 565-8500 x4425
elizabeth.joynesjordan@maketheroadny.org
frank.kearl@maketheroadny.org
sienna.fontaine@maketheroadny.org

Karla Gilbride*
Stephanie K. Glaberson*
Public Justice
1620 L. St, NW, Suite 630
Washington, DC 20036
Tel: (202) 797-8600
kgilbride@publicjustice.net
sglaberson@publicjustice.net

Beth Ellen Terrell*
Toby J. Marshall*
Amanda M. Steiner
Blythe H. Chandler*
Terrell Marshall Law Group PLLC
936 N. 34th Street, Suite 300
Seattle, Washington 98103
Tel: (206) 816-6603
bterrell@terrellmarshall.com
tmarshall@terrellmarshall.com
asteiner@terrellmarshall.com
bchandler@terrellmarshall.com

Attorneys for Plaintiffs

*application for admission or to appear *pro hac vice* forthcoming