UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

DERRICK PALMER, KENDIA MESIDOR,
BENITA ROUSE, ALEXANDER ROUSE,
BARBARA CHANDLER, and LUIS
PELLOT-CHANDLER,

    Plaintiffs,

vs.

AMAZON.COM, INC. and AMAZON.COM
SERVICES LLC,

    Defendants.

Case No. 1:20-cv-2468-BMC

---

## DECLARATION OF ALEXSIS STEPHENS

I, Alexsis Stephens, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am currently the Director of Human Resources ("HR") for the U.S. Non-Sort buildings at Amazon.com Services, LLC ("Amazon").

2. I joined Amazon in June, 2012.

3. I lead the U.S. HR Operations for the Non-Sort Buildings, including managing the HR teams in each of the Non-Sort fulfillment centers, providing coaching and guidance to leaders, providing input on policy- and process-related questions, and creating and drafting policies. Although JFK8 is an Amazon Robotics Sortable building, I am aware that the productivity and Time Off Task policies that I summarize below apply equally to JFK8.

## I. Productivity Monitoring Prior to and During the COVID-19 Crisis

4. Prior to the COVID-19 pandemic, Amazon measured associate productivity by tracking the units per hour that associates processed (for example, units scanned per hour or units packaged per hour, depending on the assigned task or "process path").

5. Productivity target rates were set periodically based on the prevailing rates for the previous five weeks. Specifically, the target was set at the 25th percentile—that is, it was set so that 75% of employees were already meeting or exceeding it.

6. Productivity target rates were usually set at least once a quarter, but could be set more frequently depending on business need. For example, during peak times, rates could be set weekly, and if a process at a facility changed significantly, rates could be reset in response.

7. Associates in the lowest fifth percentile (5%) of productivity were eligible for discipline beginning with negative productivity feedback (assuming they met certain other criteria). Associates whose pace exceeded the productivity target rate could receive positive feedback for doing so.

8. When an associate was at or below the bottom fifth percentile, proposed warnings for management's review were automatically generated through a computer system. These proposed warnings were not visible or made known to associates. The relevant managers reviewed those proposed warnings on a weekly basis to determine who, if anyone, should receive productivity feedback. Managers frequently decided to exempt from discipline many associates for whom warnings had been proposed at this stage and thus no further action was taken vis-à-vis those associates' low productivity.

9. If a manager were to consider providing negative productivity feedback to an associate, the first step would be for the manager to conduct a "seek to understand" conversation

with the associate to determine the particular circumstances surrounding and relating to the associate's low productivity. Negative productivity feedback is never to be delivered automatically or without being preceded by a "seek to understand" conversation.

10. Associates can view their performance metrics at Performance Awareness Kiosks. The available metrics alert associates if and when they fall beneath the 5% productivity mark.

11. In response to COVID-19, beginning on March 18, 2020, Amazon ceased providing productivity rate feedback to associates and imposing any discipline related to low productivity rates. Amazon made this decision to help mitigate COVID-19 risks by enabling associates to focus on social distancing, hand washing, station cleanliness, and other health and safety guidelines. On April 29, this policy was extended indefinitely.

12. Talking points explaining this shift in policy were provided to managers so that they could communicate these changes to associates. A true and correct copy of the talking points provided when the suspension of productivity feedback was first announced are attached hereto as **Exhibit A**. A true and correct copy of an email to managers on April 29 including further talking points is attached hereto as **Exhibit B**.

13. Beyond communications with managers, these changes should have been apparent to associates since, pursuant to the current policy, no associates are receiving productivity rate feedback. Associates are still able to view whether they fall beneath the 5% productivity mark at the Performance Awareness Kiosks, and thus associates with low productivity would further be aware that they personally were not receiving feedback despite being feedback-eligible.

14. When Amazon was providing productivity rate feedback to associates before March 18, the feedback was always provided sufficiently close in time to an associate's low rate for managers to be able to have an effective "seek to understand" conversation with the

associate. Furthermore, associates' productivity rates are not taken into account in connection with advancement opportunities at Amazon unless they result in a warning being delivered to the associate by a manager. Therefore, if and when productivity rate feedback resumes at Amazon, associates will not face any retroactive consequences for low productivity between March 18, 2020 and the resumption of feedback.

## II. Time Off Task

15. Amazon manages the amount of time associates spend working on their assigned tasks during their shift via the scanners that workers use to scan items, bins, and packages. When more than five minutes elapse between activity on the scanners, that time is aggregated into a "time off task" ("TOT") total for the day.

16. Certain blocks of time are exempted from TOT calculations in various ways. For example, paid breaks and lunch are automatically exempted from TOT; a visit to HR or work on a special off-task project may be exempted by a manager or by HR; an associate with a workflow problem at her station can ask a manager to exempt the time she spent addressing it, etc.

17. Associates are only subject to potential discipline for TOT that exceeds 30 minutes in a shift. No disciplinary action is taken without a manager first undertaking a "seek to understand" conversation with an associate during which the associate would be asked to explain the reason for his or her time off task that shift. Whether a manager decided to coach or warn the associate for excessive TOT would depend on the reason the associate provided, the amount of TOT, and whether the particular associate has previously received warnings related to TOT, among other factors.

18. Discipline for excessive TOT is reserved for the most egregious conduct: only the associate in each process path with the most TOT in a shift (above 30 minutes) is potentially

subject to TOT discipline—*i.e.*, only one associate per process path per shift is eligible for TOT discipline. If the manager decides not to discipline the associate after conducting a "seek to understand" conversation, then neither that associate nor any other associate would receive TOT discipline for that process path during that shift.

19. While there is no automatic TOT exemption of bathroom, hand washing, or cleaning time, managers are aware that associates should not be disciplined for time spent on such activities. This is consistent with pre-COVID-19 TOT policy and continues today. Because discipline is imposed only when TOT is in excess of 30 minutes, and even then is reserved only for the most egregious conduct in a given process path during a given shift, it is unlikely that time spent on these activities would even render an associate *potentially* subject to disciplinary action. This is particularly true in light of the fact that Amazon has extended paid breaks by 10 minutes per shift during the COVID-19 crisis in order to permit associates time to conduct the activities described above.

20. I have reviewed the relevant TOT records, which reflect that none of the employee Plaintiffs in this case—Derrick Palmer, Benita Rouse, and Barbara Chandler—has received any TOT warnings this year.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 7 day of July, 2020 at Bothell, Washington.

By: *Alexsis Stephens*

Alexsis Stephens

## Exhibit Index

| | |
|---|---|
| Exhibit A | Talking Points re: Performance Feedback Changes |
| Exhibit B | Talking Points re: Extension of Changes |