## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DERRICK PALMER, KENDIA MESIDOR, BENITA ROUSE, ALEXANDER ROUSE, BARBARA CHANDLER, LUIS PELLOT-CHANDLER, and DEASAHNI BERNARD,<br><br>Plaintiffs<br><br>v.<br><br>AMAZON.COM, INC. and AMAZON.COM SERVICES, LLC,<br><br>Defendants. | NO. 1:20-cv-02468-BMC<br><br>**AMENDED COMPLAINT**<br><br>**CLASS ACTION** |

## INTRODUCTION

1.      Defendants Amazon.com, Inc. and Amazon.com Services LLC (together, "Amazon") operate the JFK8 "fulfillment center" in Staten Island. The JFK8 facility is a small city that runs twenty-four hours a day, seven days a week and has a footprint of more than fourteen football fields. It employs thousands of workers, many of whom are people of color who travel hours every day by public transportation to work ten- to eleven-hour shifts for low wages fulfilling Amazon orders for customers across the East Coast.

2.      This case is about Amazon's failures to comply with New York law and "New York Forward" minimum requirements for businesses, which incorporate state and federal public health guidance, during the COVID-19 pandemic at the JFK8 facility. Through their common law claims Plaintiffs seek to enforce New York's *minimum requirements* for businesses in the wholesale trade sector, like Amazon's fulfillment centers, that continue operations during the pandemic.

1

3.      Amazon's failures have already caused injury and death to workers and family members of workers. At least one JFK8 worker has died from COVID-19, and there are rumors of additional deaths among JFK8 workers. Workers have brought the virus home to family members, some of whom have also tragically died.

4.      Plaintiff Barbara Chandler, for example, contracted the virus that causes COVID-19 in March at the JFK8 facility from workers who were explicitly or implicitly encouraged to continue attending work and prevented from adequately washing their hands or sanitizing their workstations.

5.      Chandler brought the virus home to her family and less than a month later, she awoke to find her cousin with whom she lived dead in their bathroom, after he had become ill with COVID-19 symptoms. As explained further below, Chandler was eligible for and requested paid COVID leave under New York law, which requires employers like Amazon to promptly issue quarantine pay to workers so that no one feels pressured to attend work when they may be sick. Despite everything she had been through, Amazon failed to pay Chandler her COVID leave in the next pay period as required. And after weeks of delay, and numerous requests by Chandler to complete the payments, Amazon still failed to pay Chandler all of the COVID leave pay to which she was entitled.

6.      Aside from their classwide claim to backpay for Amazon's failure to fully compensate workers for COVID leave, Plaintiffs in this case do not seek damages for past harm. All they seek is an order requiring Amazon to comply with public health guidance to prevent more harm in the future.

7.      This harm is not theoretical. Workers at JFK8 continue to contract COVID-19. Through May 2020, JFK8 workers continually received messages from Amazon announcing

"additional" newly confirmed cases in the facility, but it is not clear whether Amazon has continued to disclose cases. As New Yorkers continue to return to normalcy, JFK8 workers and their families live with the very real threat of infection every day.

8.      Although Amazon has sought to create a façade of compliance by, for example, providing fulfillment center employees with masks, the company has failed to comply with the fundamentals of workplace safety embodied in New York's minimum requirements and COVID leave law, as well as federal guidance incorporated by New York's requirements. Amazon has failed to (1) allow time for workers to engage in personal hygiene and sanitizing of their workstations and to socially distance during work and on breaks, (2) clearly communicate with workers about sick leave, promptly grant such leave, promptly pay workers for such leave, and pay them their complete wages for such leave, and (3) perform or provide for adequate contact tracing of its employees, in cooperation with public health authorities.

9.      Amazon is not a small business doing its best under uncertain guidance. The "minimum requirements" of New York Forward and New York's quarantine law are abundantly clear. And Amazon is not helpless to prevent injury and death caused by virus spread occurring within its facility. Amazon is one of the wealthiest companies in the world, and it uses cutting-edge technology to monitor its workers at JFK8, choreographing their locations within the facility by algorithm and using hand-held scanners and smartphone applications to record their movements and track, on a minute-by-minute basis, whether they are working or are "off task." Its failures to comply with New York's minimum requirements and New York sick leave law are inexcusable.

## PARTIES

10.     Plaintiff Derrick Palmer, a resident of New Jersey, is a Warehouse Associate, Process Guide and Picking Master in the Pick, Count, Floor-Health department at JFK8. He has worked for Amazon since July 2015 and has worked in the JFK8 facility since it opened in October 2018. In his role as a Picking Master he picks customer orders, repeatedly touching items that have been touched by other workers at JFK8. His role as a Process Guide requires regular and close interaction with around 40 other warehouse associates.

11.     Plaintiff Kendia Mesidor, a resident of New Jersey, lives with and is in a relationship with Derrick Palmer. She is anemic and at heightened risk of infection. Her potential exposure to the virus through Palmer's work at JFK8 has already caused Mesidor trauma. Mesidor's elderly father died on May 15, 2020; due to her concerns that she could be a carrier of the virus because of living with someone who works at JFK8, Mesidor was only able to see her father once during his final months.

12.     Plaintiff Benita Rouse, a resident of New York, is a Problem Solver in the inbound department at JFK8. She has worked for Amazon since March 2017 and has worked in the JFK8 facility since it opened in October 2018. In her role as a Problem Solver, she assesses whether damaged items can be re-sold, which entails touching items that have been handled by other workers at JFK8. Her role as a Problem Solver also requires regular and close interaction with her team, as they all use the same equipment and fixtures to process and dispose of products.

13.     Plaintiff Alexander Rouse, a 32-year-old resident of New York, lives with and is the only child of Benita Rouse. During the pandemic, he followed the stay-at-home order in New York City, only leaving their small apartment about once per week to get groceries, and he has

continued to limit his exposure outside of his home and followed recommended guidance around social distancing and wearing a mask since the stay-at-home order was lifted. His primary potential exposure to the virus that causes COVID-19 is through his mother, Benita Rouse.

14.     Plaintiff Barbara Chandler, a resident of New York, is a Process Assistant in the Pick, Count, and Floor-Health department at JFK8. She has worked for Amazon since February 2017 and has worked in the JFK8 facility since it opened in October 2018. In her role as a Process Assistant, she helps manage, supervise, and coach a team of about 50 people, frequently interacting closely with workers at JFK8 to ensure they are performing their tasks up to Amazon's standards and to help them solve problems in the workplace.

15.     Chandler tested positive for COVID-19 on March 26, 2020, and several members of her household subsequently became sick, including her cousin who died on April 7, 2020 after experiencing COVID-19 symptoms.

16.     Plaintiff Luis Pellot-Chandler, a resident of New York, lives with and is the oldest child of Barbara Chandler. During the pandemic, he has followed the stay-at-home order in New York City, but after his mother contracted COVID-19, he got sick and experienced symptoms of COVID-19.

17.     Plaintiff Deasahni Bernard, a resident of New York, is a member of the robotics team at JFK8. Bernard has worked for Amazon at JFK8 since November 2019. In her role on the robotics team, Bernard ensures that other warehouse associates are able to perform their tasks without any obstructions by making sure the robots are operating smoothly and helping to clear items that have fallen onto the KIVA floor (the part of the floor where the robots move to and from stations). Bernard also helps to repair the robots when problems occur.

18.     Defendant Amazon.com Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.

19.     Defendant Amazon.com Services LLC is a wholly owned subsidiary of Amazon.com, Inc.  Amazon.com Services LLC is a Delaware limited liability corporation with its principal place of business in Seattle, Washington. Defendant Amazon.com Services LLC's sole member is Amazon.com Sales Inc., a Delaware corporation with its principal place of business in Seattle, Washington.  Defendant Amazon.com Inc. is the sole owner of Amazon.com Sales, Inc.

20.     Amazon is the world's largest internet company by revenue, and, with approximately 840,000 employees, the second-biggest private employer in the United States. Amazon operates the JFK8 facility in Staten Island, New York.

## JURISDICTION

21.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity).

22.     Plaintiffs' claims arise under the laws of the United States because the question of whether Amazon's conduct violates state law involves interpreting federal rules and guidance, including guidance from the Centers for Disease Control and Prevention.

23.     This Court has diversity jurisdiction because Plaintiffs are residents of New York and New Jersey, Defendant Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington, and Defendant Amazon.com Services LLC is a Delaware limited liability corporation whose sole member is a Delaware corporation.

24.     Furthermore, the cost to Amazon of implementing the injunctive relief requested below, including the costs necessitated by providing prompt information about, and payment of,

the full amount of COVID-19 paid leave, accelerating paid time off, continuing to suspend productivity requirements, and developing and implementing a contact-tracing protocol, is in excess of $75,000.00.

25.     Venue is proper pursuant to 28 U.S.C. § 1391 in the Eastern District of New York because the acts and omissions that are the subject of this action all occurred in the Eastern District of New York.

## NEW YORK LABOR LAW CLASS ALLEGATIONS

26.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint.

27.     Plaintiffs Bernard and Chandler assert their Count III as a Fed R. Civ P. 23 class action on their own behalf and on behalf of the damages class for which they seek certification.

28.     Plaintiffs Palmer, Rouse, Chandler, and Bernard assert their Count IV as a Fed. R. Civ. P. 23 class action on their own behalf and on behalf of the injunction class for which they seek certification.

29.     Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the classes as follows:

**Damages Class:**

All Amazon employees employed in the State of New York who took leave pursuant to New York's paid COVID-19 leave statute and were not paid their regular rate of pay for their full period of quarantine and/or isolation, from March 18, 2020 through the date of final judgment in this action.

**Injunction Class:**

All Amazon employees employed in the State of New York who are eligible or who may become eligible for leave pursuant to New York's paid COVID-19 leave statute through the date of final judgment in this action.

30.     The classes are so numerous that joinder of all potential class members is impracticable.  Although the precise number of such persons is unknown, and the facts on which the calculation of that number would depend are presently within the sole control of Defendants, upon information and belief, there are more than fifty (50) members of each Class.

31.     There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions of law and fact include:

a.      Whether Amazon failed to pay New York COVID-19 leave in a timely manner, as required by N.Y. Lab. Law § 191;

b.      Whether Amazon failed to pay the full amount of New York COVID-19 leave pay, including hazard pay or other similar payments;

c.      Whether Amazon was required to and did pay workers full pay for the duration of their COVID-related absence.

32.     The class claims asserted by Plaintiffs are typical of the claims of the potential Class Members. All Plaintiffs are Amazon employees. Plaintiffs Chandler and Bernard are Amazon employees who contracted COVID-19 and allege that Amazon failed to timely pay them their New York COVID-19 leave pay in full.

33.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy. This is especially true in the case of relatively low-wage, warehouse workers, like many of the class members here, who are unlikely to seek, or able to retain, legal representation on their own.

34.     Plaintiffs Bernard and Chandler will fairly and adequately protect and represent the interests of the Damages class. They work for Defendants and are victims of the same

violations of law as the other class members, including violations of N.Y. Lab. Law § 191.

35.     Plaintiffs Palmer, Rouse, Chandler, and Bernard will fairly and adequately protect and represent the interests of the Injunction Class. They work for Defendants and are victims or potential victims of the same violations of law as the other class members, including violations of N.Y. Lab. Law § 191.

36.     Plaintiffs are represented by counsel experienced in litigating workplace safety and employment claims.

37.     Amazon has acted or refused to act on grounds that apply generally to the proposed injunction class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the class as a whole. Specifically, Amazon has failed to promptly pay members of the Injunction Class the full amount of their COVID-19 leave pay in a timely manner.

38.     Each Class Member's claim is relatively small. Thus, the interest of potential Class Members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and confirms that the pertinent federal laws are appropriate vehicles to vindicate the rights of those employees with small claims as part of the larger class.

39.     Plaintiffs are unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

40.     Plaintiffs are unaware of any pending litigation commenced by putative class members.

41.     It is desirable to concentrate this litigation in this forum because the violations alleged occurred in New York and Plaintiffs all work in the Eastern District of New York.

42.     This class action will not be difficult to manage due to the uniformity of claims among putative class members and the susceptibility of these claims to both class litigation and the use of representative testimony and representative documentary evidence.

## FACTUAL ALLEGATIONS

**The Current COVID-19 Pandemic**

43.     COVID-19 is an infectious respiratory disease caused by a novel coronavirus.

44.     COVID-19 can result in serious, long-term health complications and has resulted in over 140,000 reported deaths in the United States to date. Among these serious health complications, COVID-19 can cause inflammation in the lungs, clogging the air sacs in the lungs, limiting the body's oxygen supply and blood clots, organ failure, intestinal damage, heart inflammation, problems with the liver, neurological malfunction, and acute kidney disease.

45.     Some populations are especially vulnerable to the consequences of COVID-19, including individuals 65 years and older, people living in a nursing home or long-term care facility, and others of all ages with underlying medical conditions, such as people with lung disease, asthma, heart conditions, severe obesity, diabetes, kidney disease, or liver disease and people who are immunocompromised.

46.     Some conditions that can cause compromised immunity include cancer treatment, smoking, bone marrow or organ transplantation, immunodeficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids, and other immune weakening medications.

47.     The novel coronavirus that causes COVID-19 is also highly contagious.

48.     COVID-19 appears to spread easily and sustainably across the world through "community spread."

49.     Community spread means that people have been infected with the virus in an area, including some who are not sure how or where they became infected.

50.     The virus spreads mainly person to person, primarily through respiratory droplets produced when an infected person coughs or sneezes.

51.     Spread is more likely when people are in close contact with one another (within about 6 feet for longer than 10 minutes).

52.     The virus can be spread even by people who are "asymptomatic," meaning they carry the active virus in their body but never develop any symptoms; "pre-symptomatic," meaning they have been infected and are incubating the virus but don't yet show symptoms; or very mildly symptomatic.

53.     Recent research from the Centers for Disease Control and Prevention ("CDC") suggests that a single person with COVID-19 is likely to infect five or six other individuals absent aggressive social distancing practices.

54.     The best way to prevent illness is to avoid being exposed to this virus.

**New York's Response to the COVID-19 Pandemic**

55.     New York's first confirmed case of COVID-19 was announced on March 1, 2020.

56.     In the following weeks, New York became the global epicenter of the pandemic, with over 417,000 cases and 32,000 deaths to date. Officials estimate there are many more unconfirmed cases of the virus that resulted in many additional deaths.

57.     New York City continues to record new cases of COVID-19.

58.     Currently, some individuals seeking COVID-19 tests in New York and around the country are experiencing lengthy delays in receiving their test results.

59.     In addition to illness and death on a massive scale, the New York economy has been hard-hit by the pandemic. At the end of April, an estimated 1.2 million New Yorkers—27 percent of all private-sector workers—were estimated to be jobless.

60.     On March 20, 2020, Governor Andrew Cuomo issued the "New York State On PAUSE" Executive Order ("NYSOP").

61.     Under NYSOP, effective 8:00 p.m. on March 22, 2020, all non-essential businesses in the state were closed. NYSOP permitted "Essential Businesses," defined as those providing products or services that are required to maintain the health, safety, and welfare of the citizens of New York State, to stay open.

62.     Amazon is an "Essential Business."

63.     All Essential Businesses must continue to comply with the guidance and directives for maintaining a clean and safe work environment issued by the New York State Department of Health.

**The New York Forward Plan**

64.     Beginning in May 2020, New York began a phased reopening of previously closed businesses under the New York Forward plan. As part of this plan, the state has provided detailed industry-specific guidance for businesses that are reopening, as well as those, like Amazon, that were deemed essential and continued their operations during NYSOP.

65.     These guidelines are "minimum requirements"[1] that businesses must follow to remain open.

---

[1] Interim Guidance for the Wholesale Trade Sector During the COVID-19 Public Health Emergency,
https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/WholesaleTradeMasterGuidance.pdf.

66.     A business can determine which set of New York Forward minimum requirements apply to it by inputting its NAICS code on the New York Forward website.

67.     Amazon fulfillment centers typically operate pursuant to NAICS code 423990, which applies to Other Miscellaneous Durable Goods Merchant Wholesalers.[2]

68.     Accordingly, the New York Forward Interim Guidance for the Wholesale Trade Sector (the "Wholesale Guidance"), which applies to *all* wholesale trade businesses, including essential businesses, in New York state, applies to Amazon's JFK8 operations.

69.     The Wholesale Guidance "was created to provide owners/operators of wholesale trade businesses and their employees and contractors with precautions to help protect against the spread of COVID-19[.]"

70.     New York's Wholesale Guidance requires that subject businesses, among other things, do the following, which are described as "minimum requirements":

    a.      Operate at no more than 50-percent occupancy as reflected on the facility's Certificate of Occupancy, except that if more workers are needed to continue safe operations, then additional mitigation measures must be taken;

    b.      Implement policies to minimize sharing of objects and touching of shared surfaces, and when sharing of objects or touching of shared surfaces cannot be avoided, require that workers wash or sanitize their hands before and after use;

    c.      Provide hand washing stations and supplies (including warm water, soap

---

[2] Even if a different category of minimum requirements applies to the JFK8 facility, comparable requirements exist in the other categories of the New York Forward plan that could potentially apply.

and paper towels) for employee use

d.    Stagger shifts and breaks to minimize opportunities for congestion in

hallways, break rooms, bathrooms, etc., and stagger scheduled tasks so

that multiple teams are not working in the same area at the same time;

e.    Ensure that workstations are cleaned and sanitized between shifts and that

shared tools and equipment are cleaned and sanitized before a different

worker uses them;

f.    Conduct regular, ongoing cleaning of the entire facility, giving particular

attention to frequently touched surfaces and high-risk areas where many

workers are present, and keep a log of all cleaning activities;

g.    If cleaning products are provided to workers to clean their own

workstations, allocate time during shifts for this cleaning to be conducted;

h.    Conduct health screenings of all people entering the facility including

asking if they have experienced symptoms of COVID-19 or been in

contact with someone who has tested positive for the disease in the past 14

(fourteen) days, and keep a log of all responses to these questions to

facilitate contact tracing efforts;

i.    Cooperate with local health departments if someone at the facility is

diagnosed with COVID-19 by providing a list of all workers and visitors

who entered the facility within 48 hours of the time the infected person

was diagnosed or began experiencing symptoms, whichever was earlier.

j.    Develop a communications plan for employees, visitors, and customers

that includes applicable instructions, training, signage, and a consistent

means to provide employees with information.

**New York's Paid COVID Leave Law**

71.     One of the other early steps that New York State took to protect the public was to ensure that essential workers and others had access to paid sick leave when they had to quarantine pursuant to state law because they had contracted or been exposed to the virus and experienced symptoms.

72.     This protection has been an essential feature of New York's public health policy because it ensures that workers, including the millions of essential workers in New York State who do not have the savings to lose the income they make from work, are not encouraged to leave their homes and expose their coworkers by continuing to work.

73.     New York law and guidance are clear that for sick leave to be effective, employers must adequately communicate with their workers about the accessibility of New York COVID leave.

74.     Employers must let their employees know that these benefits are available to them, should they be subject to a mandatory or precautionary order of quarantine or isolation. If an employer has a specific process for handling these claims with its employees, the employer must advise them accordingly.[3]

75.     There are several ways for a worker to become eligible for New York COVID leave. In New York City, such leave is immediately available to any essential worker subject to an order of isolation. An order of isolation is immediately issued for any essential worker who can self-attest that they have had contact with someone with COVID-19 and are experiencing

---

[3] COVID-19 Paid Leave: Guidance for Employers, available at https://paidfamilyleave.ny.gov/covid-19-paid-leave-guidance-employers (last visited July 28, 2020).

symptoms or that they have been instructed by a healthcare provider to isolate.[4]

76.     Under New York's paid COVID leave protection,[5] workers are guaranteed job protection and financial compensation if they become subject to a mandatory or precautionary order of quarantine or isolation issued by the New York State Department of Health, local board of health, or any government entity duly authorized to issue such order due to COVID-19.

77.     New York law requires small employers to provide unpaid leave until the termination of any mandatory or precautionary order of quarantine or isolation. Medium-sized employers and small employers with over $1 million net income in the prior year must provide at least five days of paid sick leave and unpaid leave until the termination of any mandatory or precautionary order of quarantine or isolation.

78.     Large employers – like Amazon – must provide *at least* fourteen days of paid sick leave during any mandatory or precautionary order of quarantine or isolation.

79.     A worker subject to a mandatory or precautionary order of quarantine or isolation must be paid their sick leave in the next pay period so that no one is encouraged to work outside of the home when sick.[6]

**The Centers for Disease Control Response to the COVID-19 Pandemic**

80.     In response to the COVID-19 crisis, the CDC published guidance for employers and employees, including Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19).

---

[4] Order of the Commissioner of Health and Mental Hygiene of the City of New York for Isolation, Appendix B, Isolation for Essential Personnel other than Healthcare Personnel, https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-paid-sick-leave-order.pdf.
[5] New Paid Leave for COVID-19, https://paidfamilyleave.ny.gov/COVID19.
[6] New York Paid Sick Leave Frequently Asked Questions, https://paidfamilyleave.ny.gov/new-york-paid-family-leave-covid-19-faqs ("The paid sick leave payments are subject to the frequency of pay requirements of Section 191 of the Labor Law, and leave payments should be made in the paycheck for the applicable pay period for the leave.").

81.     The New York Forward minimum requirements expressly require businesses to comply with CDC guidance.

82.     The purpose of the CDC guidance is to "help prevent workplace exposures to COVID-19, in non-healthcare settings" and to "provide[] planning considerations for community spread of COVID-19." *Id.*

83.     The following is a summary of some of these guidelines:

a.      Employees who have symptoms should stay home and employers should develop flexible leave policies to allow employees to stay home, particularly by creating non-punitive sick leave policies such as giving advances on future sick leave;

b.      Employers should not require a positive COVID-19 test or a healthcare provider's note for employees to take sick leave;

c.      Sick employees should not return to work except in consultation with independent health care providers and state and local health departments;

d.      Employers should reduce face-to-face contact between employees;

e.      Employers should take steps to reduce transmission at the workplace by reassigning work tasks to maintain social distance of six-feet, staggering shifts, or allowing telework;

f.      Employers should establish policies to minimize spread through a workplace by identifying workers who have likely been exposed to the disease, including in some cases through contact tracing that requires a review of close contacts over the 48 hours before symptoms of the disease emerged;

g.    Employees should be encouraged to wash their hands and employers should facilitate this by providing hand washing stations;

h.    Employers should provide tissues;

i.    Employers should increase ventilation rates; and

j.    Employers should develop plans to clean high touch areas with an EPA-approved cleaning agent.

**Amazon Fails to Follow New York's Minimum Requirements to Prevent Transmission of COVID-19 at JFK8**

84.    During NYSOP, Amazon has kept JFK8 open as an essential business.

85.    JFK8 is a building that occupies approximately 840,000 square feet and is located in the Bloomfield neighborhood on the west shore of Staten Island.

86.    On average there are approximately 3,500 workers at JFK8. During peak seasons, which include months leading up to Christmas and the time around Amazon Prime Day in July, the workforce swells to approximately 5,000 workers.

87.    The workforce at Amazon has similarly swelled during the COVID-19 pandemic. Amazon has said it hired 175,000 new workers in April.

88.    At JFK8, many of the new workers are temporary workers hired to meet increased demands during the pandemic.

89.    Full-time JFK8 workers typically work 10.5-hour or 10.75-hour shifts, four days per week.

90.    During peak seasons these workers are expected to work "mandatory extra time" shifts, or "MET," of an additional 10-hour shift each week.

91.    Amazon has required some workers to work "mandatory extra time" because of increased demands during the pandemic.

92.     For example, on March 18, 2020 Amazon sent a text message to workers at JFK8 with a "reminder that All departments will be on MET For the week of March 22nd" and encouraged workers to come in to work because customers were relying on them more than ever.

93.     On July 22, 2020, Amazon sent a text message to some workers at JFK8 advising that Amazon had instituted mandatory extra time for shifts during the week of July 26, 2020.

94.     JFK8 also employs part-time workers who typically work 10-hour shifts, 3 days per week as well as flex-shift workers and variable-shift workers who have individualized schedules based on their availability.

95.     Because of JFK8's somewhat remote location, many workers take multiple forms of public transit to get to work. Those workers who do not have their own cars typically take public transit in New York City to the Staten Island Ferry and then board a city bus, the S40 or the S90, from the St. George Terminal to the facility.

96.     Around March 24, 2020, workers at JFK8 began raising concerns about Amazon's failure to take steps to ensure their safety.

97.     Specifically, workers were concerned that management was withholding information about positive cases in the facility, refusing to shut down the facility for a deep sanitization as had been done in other Amazon facilities with positive cases, failing to implement and enforce policies to allow for adequate social distancing, and failing to improve access to leave for workers who were sick, who had family members who were sick, or who believed they had been exposed to someone with COVID-19.

98.     Amazon has disciplined several workers who spoke out about health and safety concerns at JFK8, including Plaintiff Derrick Palmer.

99.     Upon information and belief, as of July 28, 2020, there have been at least 51

confirmed cases of COVID-19 at JFK8.

100.    Upon information and belief, as of July 28, 2020, at least one, and possibly more,
JFK8 workers have died of COVID-19-related causes.

101.    As of July 28, 2020, at least 4 family members or others who share living space
with JFK8 workers have become infected with COVID-19, including three children and one
cousin of Plaintiff Barbara Chandler. At least one of these individuals died.

**Amazon Discourages Workers from Taking COVID Leave and Does Not Promptly Pay
Workers for COVID Leave as Required by New York Law**

102.    New York State law is abundantly clear: paid sick leave for workers is essential to
preserve the public health during this pandemic.

103.    If workers feel pressure, whether explicit pressure from their employers or
implicit economic pressure, to continue coming to work even when they may have the virus that
causes COVID-19, the public health will suffer.

104.    Clearly communicating with workers about access to leave, promptly providing
them with that leave, and promptly paying them for that leave is essential to protect the public
health.

105.    Although Amazon purports to comply with New York COVID leave law, it fails
to abide by either the letter or the spirit of that law by obfuscating and miscommunicating with
workers regarding the availability of leave.

106.    Amazon also fails to promptly pay workers when they stay home from work
consistent with New York COVID leave laws.

107.    Access to prompt, full payment for COVID leave is essential to ensuring that
workers can, consistent with the purposes of New York law, remain safely at home if they are or
may be sick, confident that their income will not suffer as a result. That is a public health

20

imperative.

108.    The potential availability of other forms of leave for Amazon workers does not absolve Amazon of its responsibility to make COVID leave easily accessible.

109.    Many categories of paid and unpaid leave at Amazon are only accessible to workers who have formally applied to Amazon for such leave.

110.    Leave made available to workers at the employer's discretion is insufficient to mitigate the public health consequences of not providing adequate leave, particularly for low-wage workers in workplaces where workers fear retaliation for seeking leave.

**Amazon's Other Forms of Leave Do Not Absolve It of Its Duty to Follow New York Paid COVID Leave Law**

111.    Some JFK8 workers may be entitled to some amount of automatic unpaid leave or "UPT," which accrues at 20 hours per quarter.

112.    Amazon deducts a full hour of UPT each time a JFK8 worker is more than five minutes late to work.

113.    This is true even if their lateness is due to public transportation problems, which have frequently occurred due to limited public transit during the pandemic.

114.    Furthermore, once a worker loses all his or her accrued UPT, he or she can be automatically fired for arriving late to work, even by a minute.

115.    The critical importance of UPT, and the potential consequences of running out of it, mean that workers fear running out of UPT for matters that cannot be controlled, like public transportation delays.

116.    As a result, workers are fearful of using up their UPT and guard it closely.

117.    Due to the COVID-19 pandemic, Amazon provided JFK8 workers with unlimited UPT for a period of time that included part of March and all of April 2020.

118.     Amazon recognized that this policy was essential to ensuring workers would feel safe staying home from work when they were sick.

119.     In May 2020, Amazon reinstated its usual limits on UPT.

120.     Since then, workers have struggled once again to retain their UPT and therefore feel increased pressure to attend work while sick or when they believe they were exposed to a COVID-19 positive individual.

121.     Because of the risks of unemployment, especially now, when the unemployment rate is higher than at any time since the 1930s, Amazon's unpaid leave policy is insufficient to reassure workers that they can miss work because of illness or exposure to illness.

122.     Workers at the JFK8 facility are also entitled to up to 48 hours of paid leave over the course of a year (called Paid Time Off or "PTO"), but which accrues at a gradual rate of one hour for every thirty hours of work in accordance with New York City paid sick leave laws.

123.     The amount of paid leave JFK8 workers are entitled to is inadequate to encourage workers to take sufficient time away from work when they are experiencing symptoms of COVID-19 or have been exposed to the virus that causes COVID-19, particularly because of how slowly it accrues and the fact that many of Amazon's newer workers have access to little or no PTO.

124.     Amazon's punitive policies regarding unpaid leave further exacerbate the problem of the amount of paid leave being inadequate. Workers hesitate to use their city-mandated paid sick leave when they are sick because they are fearful that they may need to use it if, for example, they are late for work and unpaid leave is not available or during "blackout" periods when they are not entitled to use discretionary leave time.

125.     Amazon's unwillingness to provide easily accessible leave for workers who

believe they may be infected with COVID-19 encourages workers to come to work when they are sick, exacerbating spread of the virus in the facility and beyond.

**Amazon's Human Resources Department Fails to Provide Prompt or Adequate Responses to COVID-19-Related Leave Requests**

126.   When workers at the JFK8 facility appear to have symptoms of COVID-19 or believe they have come into close contact with the virus, Amazon requires them to communicate with Amazon's human resources team before they stay home pursuant to New York's COVID leave laws.

127.   Because of Amazon's byzantine protocols related to COVID leave, and its retaliation against workers who speak out about workplace safety and COVID-19, many Amazon workers are confused about the process and fearful about what will happen if they pursue COVID leave.

128.   Even when workers do affirmatively seek out information from Amazon about whether they should quarantine and whether they will be able to access paid COVID leave, Amazon is slow to respond, causing workers to attend work even when they may be sick.

129.   For example, in May 2020, Plaintiff Benita Rouse heard from a co-worker with whom she had close contact at work for several days that he had tested positive for COVID-19.

130.   Rouse was concerned by her close contact with someone who had the virus but did not believe she could access COVID leave without first speaking to Amazon's human resources department.

131.   Other leave available to Rouse, including unpaid leave, was dwindling, and she was fearful of using it knowing that she would likely need it someday to avoid discipline by Amazon.

132.   The day after learning of their co-worker's diagnosis, Rouse and another

co-worker who had also been in close contact with the COVID-19 positive individual attended

work and spoke to someone in Amazon's human resources office.

133.    The human resources employee told Rouse to go home and said that the human

resources employee could not make the decision herself but that someone who "gets paid more"

than her would call Rouse about whether she could access COVID leave under New York law.

134.    Rouse did not receive a follow-up call to inform her whether to go to work.

135.    Rouse repeatedly called three different Amazon HR phone numbers, but did not

reach anyone and only got a recording.

136.    Rouse then called the main building number and reached a security guard at the

front desk of the facility. Rouse told the guard she was waiting for instruction about whether to

come to work or quarantine. Rouse informed the guard that no one from HR had followed up

with her since their meeting the day before. The guard told Rouse he would give the message to

Heather in HR.

137.    Rouse also used Amazon's Chime messaging system to message a colleague to

see if he could help her to get information from management about whether she should come to

work that day.

138.    Rouse explained that she had been sent home due to a coworker having COVID-

19, and that she was waiting to find out whether she should quarantine. Rouse's coworker told

her not to tell anyone and said he would speak with HR.

139.    Rouse continued to call HR repeatedly throughout the morning, but was only able

to reach a recording. Rouse did not hear anything from HR or any other representative from

Amazon.

140.     Eventually, Rouse's co-worker suggested she contact someone else in HR, and suggested that she try sending an email to a dedicated JFK8 HR email address.

141.     Rouse had already attempted to send an email to jfk8-askhr@amazon.com from a computer at JFK8 the day before, but it didn't work.

142.     Rouse then messaged Nela Deakova, a manager at JFK8, seeking guidance on what to do. Rouse explained the steps she had taken to get guidance on whether to come to work in light of her exposure.

143.     Eventually, the manager responded, instructing her to "pls be patient and we will get back to you, contact tracing takes some time."

144.     Rouse understood Deakova's response to mean that Amazon was engaging in contact tracing related to her co-worker's positive COVID-19 results.

145.     Rouse asked whether she should stay home, but Deakova responded, "can you pls give me a second . . . i was trying to get the answer for you . . . you can return to work."

146.     Plaintiff Deasahni Bernard began experiencing symptoms of COVID-19 at work on March 25, 2020.

147.     Bernard stayed home during a mandatory overtime shift on March 26, 2020, because she was feeling sick.

148.     Bernard sought medical attention and a test for COVID-19. She stayed home from work during the weeks of March 28 and April 5, 2020. Bernard used UPT for these absences.

149.     Bernard was finally able to receive a COVID-19 test on April 8, 2020.

150.     Bernard learned that she had tested positive for COVID-19 on April 13, 2020.

151.     She immediately notified an HR manager, Tyler Grabowski.

152.    Grabowski told Bernard that she would be eligible for two weeks of paid COVID leave, and that she could receive short-term disability payments for the time she had self-quarantined prior to learning her positive test results.

153.    On April 14, 2020, Bernard contacted Amazon's "Employee Resource Center," or ERC, to notify them of her positive test and begin the process of requesting paid COVID leave. ERC advised Bernard that she could receive quarantine pay, but did not tell her what steps she needed to take to access the benefit.

154.    On April 15, 2020, having heard nothing from Amazon about her request for COVID leave, Bernard sent Grabowski a message on Amazon's Chime system to ask whether she needed to send her COVID-related documents to anyone else. Grabowski instructed Bernard to email the test result to Amazon's "Leave of Absence" team. Bernard did so.

155.    On April 15, 2020, Bernard received an email from the Leave of Absence team confirming receipt of her COVID-19 test result.

156.    Other than the acknowledgment email of April 15, Bernard heard nothing further about her request for paid COVID leave until April 27, 2020.

157.    During that time, Bernard repeatedly contacted Amazon's ERC to find out the status of her leave request, but was unable to learn whether the request had been approved.

158.    Bernard sometimes stayed on hold with ERC for as long as 90 minutes.

159.    On at least one occasion, Bernard's call was disconnected before she could speak with anyone.

160.    When she was finally able to speak with someone at ERC, Bernard was told that a case manager was assigned to her case, but she was not able to speak with them during that call.

161.    On April 27, 2020, two weeks after she first tested positive for COVID-19, Bernard called ERC to inform Amazon that she was still experiencing COVID-19 symptoms and was not well enough to return to work. Bernard requested an unpaid leave of absence.

162.    Later that day, Bernard received a document by email stating that Amazon had initiated a leave extension request. In the same document, Amazon informed Bernard that her initial request for COVID leave had been approved that same day – April 27, 2020. This was the first indication that Bernard received that her request for paid COVID leave was approved.

**Amazon Fails to Promptly Pay COVID Leave**

163.    Even when Amazon workers stay home from work because they are sick with COVID-19 or are subject to a quarantine order, Amazon makes it difficult for them to obtain their state-required pay for their quarantine.

164.    Amazon fails to pay employees for the full amount of their COVID leave on their next paycheck for the amount that the worker would have otherwise received had they been continuing to work, as required by New York law.

165.    Amazon fails to include premiums such as hazard pay in employees' COVID leave payments.

166.    Amazon also pays employees who are absent due to COVID-19 for more than 14 days at the short-term disability rate of 60 percent of their pre-COVID hourly wage, not including hazard pay.

167.    For example, when Plaintiff Barbara Chandler was worried that she might have contracted COVID-19 at the facility, she was fearful of missing work and of using precious time off. Chandler ultimately used some of her available UPT to take time off work.

168.     On March 26, 2020, Chandler learned over the phone that she had tested positive for the virus after calling the clinic where she was tested a few days earlier.

169.     Chandler immediately sent Chime messages to Tyler Grabowski in the Human Resources department ("HR") and to several other members of upper level management at JFK8, letting them know about her positive test.

170.     Shortly thereafter, Chandler received a phone call from Tyler Grabowski informing her that he would need to see proof of the positive test results before he would "escalate" the case to Amazon HR for the purposes of providing her with COVID leave pay. Grabowski also instructed Chandler not to tell anyone about her positive test.

171.     As soon as Chandler was able to receive proof of her positive test later that evening, she sent it via Chime to Grabowski.

172.     Grabowski replied to Chandler that he would "open up the escalation to global security."

173.     On March 26, 2020, after notifying Amazon about her positive COVID-19 test, both Grabowski and a Senior Operations Manager told Barbara Chandler that she would be contacted by HR about next steps.

174.     At 8:20 p.m. on the evening of March 27, 2020, Chandler had still not been contacted by anyone at HR about quarantine so she sent a Chime message to Grabowski asking when she should plan to return to work and asking if she was going to get two weeks of paid leave.

175.     On or around March 28, 2020, Grabowski called Barbara Chandler to inform her she was going to be on two-week quarantine. Grabowski asked Chandler to contact the Employee Resource Center ("ERC").

28

176.    Later that day, Chandler talked to ERC by phone and they informed her they had completed her leave of absence documents so that she could receive quarantine pay, and they assigned her a case manager from the Leave of Absence team ("LOA").

177.    On April 1, 2020, Chandler received an email from ERC that included a "Decision Notification" about her request for a leave of absence that showed she was approved to receive Federal FMLA and a Medical Leave of Absence from March 25, 2020 until April 7, 2020. The document also said that she had been approved for Short Term Disability from April 1, 2020 through April 7, 2020.

178.    The letter also said that all Amazon employees who were diagnosed with COVID-19 would receive up to two weeks of pay.

179.    This was the first document Barbara Chandler received that had any information about her paid COVID leave, or what Amazon calls "Special COVID-19 Pay".

180.    On or around April 7, 2020, Chandler saw in Amazon's A to Z App that she had been returned to the schedule beginning on April 12, 2020.

181.    Chandler returned to work at JFK8 on April 12, 2020.

182.    In total, Chandler missed 9 scheduled days of work due to COVID-19.

183.    On April 10, 2020, Chandler received a direct deposit from Amazon for 56 hours of paid COVID leave, which was coded "guarantee pay" on her paystub.

184.    This 56 hours was significantly fewer hours than she would have normally worked in two weeks. Chandler's schedule at the time was four 10.5-hour shifts, with a 30-minute unpaid lunch break, each week. Chandler's work schedule required her to work Sunday, Monday, Tuesday, and Wednesday each week, for a total of at least 40 hours per week.

185.    This 56 hours was also significantly fewer hours than Amazon's purported policy of assuming 40 hours a week (8 hours a day for 5 days a week, Monday through Friday) for Special COVID-19 Pay.

186.    On April 17, 2020, Chandler received a direct deposit from Amazon for $210.86, which was coded as "Shrt Term Dis."

187.    Chandler repeatedly asked managers at JFK8 why she had not received a full two weeks of COVID pay and was repeatedly told that she would see the money on the following paycheck. Chandler tried to contact ERC, and left numerous messages for them, but did not receive a call back.

188.    On or around April 29, 2020, Chandler sent a Chime message to Heather Mirabal, a senior HR manager at JFK8, asking why she had not received the remaining 24 hours of her COVID pay. Mirabal told Chandler that she had brought it up with her "BPs" earlier that week.

189.    On May 20, 2020, Chandler still had not received her final 24 hours of COVID pay and she sent a message to management on Amazon's internal Voice of the Associate message board ("VOA") demanding her final 24 hours of COVID pay.

190.    Later in the day on May 20, 2020, Chandler received a Chime message from Neha Viswanath in HR informing Chandler that the leave of absence team had initially determined that she was not eligible for 80 hours of COVID pay, but they had given "site approval" to have the full 80 hours paid because that was what had been initially promised to her. Viswanath said that she had escalated Chandler's case but they were behind in processing. Viswanath told Chandler that she would hopefully see the money on her next check.

191.    Chandler asked Viswanath why she was not deemed eligible for a full 80 hours of COVID pay, despite having tested positive for COVID-19 and being a full-time worker, and

Viswanath informed Chandler that Amazon only promises "up to" two weeks of pay and that not everyone gets the same benefit.

192.   Later in the day on May 20, 2020, Chandler received a message from Mirabal saying that she had "good news" and that Chandler would receive the remaining 24 hours of COVID pay on May 29, 2020. However, Mirabal was unable to confirm whether the remaining 24 hours would be paid at 100% under the COVID leave pay policy or at 60% under the Short Term Disability policy.

193.   On May 27, 2020, when Chandler was able to access her upcoming May 29, 2020 pay statement, she saw that Amazon had in fact only coded her remaining 24 hours of COVID pay as Short Term Disability at 60% of her regular rate. Chandler contacted Viswanath via Chime and asked her why she was again failing to receive her full two weeks of COVID pay at 100% of her regular rate.

194.   Viswanath said she would "follow up with them" to see why the hours were coded as Short Term Disability and agreed to add 10 hours of "company business" pay to the May 29, 2020 paycheck.

195.   When Chandler informed Viswanath that the additional 10 hours would still be $10.16 less than what was promised to her, Viswanath agreed to add 11 hours of "company business" pay instead.

196.   On May 29, 2020, Chandler received Short Term Disability pay for the remaining 24 hours of COVID leave.

197.    Viswanath told Chandler that she would get the remainder of her COVID pay on June 5, 2020.

198.    On June 5, 2020, Chandler received a paycheck for the pay period of May 24, 2020 through May 30, 2020.

199.    The June 5, 2020 paycheck included payment for 29.18 hours coded "Regular" and paid at a rate of $20.80, 13.38 hours coded "Double Time" and paid at a rate of $41.60, 10.82 hours coded "Holiday O/T" and paid at a rate of $31.20, 10.82 hours coded "H05" and paid at a rate of $10.40, 8 hours coded "Holiday Pay" and paid at a rate of $20.80, 53.38 hours coded "Additional pay" and paid at a rate of $2.00, and 24.20 hours coded "O/T Premium" and paid at a rate of $2.00.

200.    Amazon did not pay any part of Chandler's COVID pay at the rate including $2 per hour extra of "hazard pay" she would have received had she been at work during that period.

201.    Amazon paid a portion of Chandler's COVID pay as "Short Term Disability" at 60 percent of her pre-COVID-19 rate of $20.50. This rate did not reflect the $2/hour hazard pay, or a $0.30 per hour raise she received effective March 29, 2020.

202.    As of July 28, 2020, Barbara Chandler still has not received full payment for her more than two weeks of COVID-related leave even though those benefits are supposed to be paid out to workers in the next pay period.

203.    Although Chandler has still not been fully compensated for her COVID leave, she received much of her compensation for that period only after repeated calls and inquiries with Amazon's HR personnel, over a period of many weeks.

204.    Similarly, on May 1, 2020, Plaintiff Bernard received payment, coded as "regular" pay, for 50 hours at her pre-COVID-19 rate of $18.30. The earnings statement she received indicated that the payment was to cover her wages for the period of April 19-25, 2020, during which she had been isolated following her COVID-19 diagnosis.

32

205.     On May 8, Bernard received payment, coded as "regular" pay, for 20 hours at the rate of $18.70, reflecting a scheduled raise. The earnings statement she received indicated that the payment was to cover her wages for the period of April 26-May 2, 2020.

206.     In total, Bernard received 70 hours' worth of pay for the time she spent in isolation after testing positive for COVID-19.

207.     However, Bernard's schedule required her to work at least 40 hours per week. Bernard would have worked at least 80 hours during the time she spent in isolation after testing positive for COVID-19.

208.     Amazon paid Bernard's 70 hours of COVID pay at the rate of $18.30 for the first pay period, and $18.70 for the second pay period.

209.     Amazon did not include in Bernard's COVID pay the $2 per hour in hazard pay that Bernard would have earned had she continued working at JFK8.

210.     This is true even though, as a full-time employee, Bernard would have worked 80 – not 70 – hours during the two-week period of quarantine prior to her positive COVID-19 test. In addition, Bernard was earning $2 per hour in hazard pay at the time she took leave, but Bernard's COVID leave payments did not reflect that hazard pay.

211.     In defiance of New York COVID leave laws, Amazon fails to make such leave available to workers promptly without requiring them to navigate Amazon's automated and broken human resources systems, fails to pay them promptly for such leave, and fails to pay them their complete wages for such leave.

212.     These problems are not limited to Rouse, Bernard, and Chandler. Public reporting from June and July regarding sick leave for Amazon fulfillment center workers makes clear that Amazon's "heavily automated" HR systems have prevented workers from obtaining information

about leave, accessing such leave without being scheduled to work, and obtaining prompt and complete payment for leave.[7]

213.    In March and April, when workers had access to unlimited UPT, these HR failures were less of a problem, but today, an employee must apply for sick leave through Amazon, and that process is "plagued by confusion and delays" that have caused workers to attend work sick.[8] Those failures are inconsistent with New York law.

**Amazon's Production Requirements Prevent Workers from Engaging in Basic Hygiene and Sanitizing Tasks and Social Distancing**

214.    Amazon uses real-time tracking of employee activity on scanner devices that workers use to scan items, bins, and packages, in order to track whether workers at JFK8 are "on task" or "off task" for every minute of work.

215.    During every minute of each shift, including during paid rest breaks, Amazon tracks—down to the minute—whether the worker is actively engaged in work based on whether they perform a task in that minute and aggregates a total time off task ("TOT") for each worker every day.

216.    If a worker has more than 30 total minutes of TOT in a shift, other than their paid break time, they receive a written warning.

217.    If a worker has more than 60 total minutes of TOT in a shift, other than their paid break time, they receive a final written warning.

---

[7] Matt Day, *Amazon's Heavily Automated HR Leaves Workers in Sick Leave Limbo*, June 5, 2020, https://www.bloomberg.com/news/articles/2020-06-05/amazon-s-heavily-automated-hr-leaves-workers-in-sick-leave-limbo.

[8] Spencer Soper, *Amazon Workers in Memphis Are Spooked as Virus Rages in South*, Bloomberg, July 14, 2020, https://www.bloomberg.com/news/articles/2020-07-14/covid-19-amazon-workers-in-memphis-are-getting-sick-now.

218.    If a worker reaches 120 minutes of TOT in a shift, other than their paid break time, Amazon automatically terminates them.

219.    Although supervisors are authorized to re-code TOT for certain activities so that it does not count against the worker, supervisors cannot re-code TOT for bathroom breaks, including trips to the bathroom for handwashing purposes.

220.    Instead, discipline for bathroom breaks is up to the discretion of supervisors.

221.    In July 2020, Amazon informed workers that time spent maintaining social distancing, handwashing, sanitizing workstations, and using the restroom would not be subject to feedback relating to TOT. However, the TOT policy otherwise remains in effect.

222.    Although workers in some departments are able to indicate on their kiosks when they stop work due to a dangerous condition, equipment malfunction, or injury, Amazon does not provide workers at JFK8 with any mechanism to affirmatively indicate that they are taking time away from their duties to use the bathroom.

223.    This process, called "pulling an Andon," permits workers to select the reason for their "Andon" from a pre-set list of options grouped into priority "blocking" and non-priority "non-blocking" reasons.

224.    There are no Andons for using the bathroom, sanitizing a workstation, washing hands, or social distancing.

225.    In addition, Amazon monitors workers minute-to-minute to assess whether they are scanning items quickly enough.

226.    Typically, Amazon expects workers at JFK8 in the pick department to pick a total of 400 items per hour.

227.    In the count department, workers are expected to count 750 items per hour in simple bin count, 320 items per hour in simple record count, and 175 items per hour in cycle count.

228.    Prior to the pandemic, workers who were not able to maintain Amazon's set rates were given verbal warnings and workers who consistently underperform compared to Amazon's rates were disciplined with write-ups or termination.

229.    In March 2020, according to internal corporate documents, Amazon stopped providing feedback to workers who were not maintaining their rate, and stopped imposing discipline about failure to meet rate.

230.    However, Amazon did not directly and publicly communicate that change to workers until July 13, 2020, after Plaintiffs filed this lawsuit.

231.    On July 13, 2020, Amazon sent an "inSITES" email to some JFK8 workers telling them that "since mid-March 2020, we have temporarily suspended our productivity feedback." On July 13, 2020, Amazon also posted an "inSTALLment" message in some bathrooms in the JFK8 facility with the same information.

232.    Prior to the actions Amazon took on July 13, Amazon communicated information about the change in rate enforcement to managers with a list of "talking points."

233.    Amazon specifically instructed its managers not to post the talking points publicly.

234.    Upon information and belief, many workers at JFK8 remain unaware that rate requirements have been relaxed during the pandemic.

235.    Amazon does not automatically provide its warehouse workers with real-time information about how much TOT they have accrued over the course of their shift or about how

fast they are picking or counting items.

236.    Many workers learn about their TOT or rate only when they are subject to discipline for not working fast enough or taking too much time away from their workstations.

237.    Therefore, these workers are unaware of how close they may be to hitting a TOT or rate-based disciplinary benchmark.

238.    Because of these time pressures and the absence of information about pace of work and TOT, Amazon warehouse workers are forced to work at a frenzied pace.

239.    Even after Amazon officially suspended rate requirements, it failed to communicate that suspension publicly to workers until July 13, 2020.

240.    Even after July 13, 2020, managers continued to post rate goals on white boards in the facility and encourage workers to meet their goals.

241.    Amazon's TOT and rate policies are oppressive and dangerous, even absent a pandemic.

242.    Based on a sample of records from Amazon facilities around the country, the National Employment Law Project and a coalition of workers' rights organizations determined that the Total Recordable Injury Rate at Amazon facilities in 2018 was 10.76 per 100 workers.

243.    This is three times as high as the injury rate across all private employers (2.8 recordable injuries per 100 workers) and more than twice as high as the injury rate in the notoriously hazardous general warehousing industry (5.2 recordable injuries per 100 workers)

244.    The National Council for Occupational Safety and Health (NCOSH) included Amazon on its "dirty dozen" list of especially unsafe workplaces in 2019. NCOSH reported that Amazon workers "labor at a relentless pace, with constant monitoring of their activities. This high stress environment leads to physical and emotional ailments—but reports indicate that the

company does not provide adequate support to those suffering on-the-job injuries."

245.     In the context of the COVID-19 pandemic, the relentless pace of work at Amazon facilities becomes even more dangerous because the TOT and rate policies discourage workers from leaving their workstations to wash their hands and from taking the time to wipe down their workstations.

246.     This is particularly true because of the size of JFK8. A bathroom or handwashing station can easily be a 7-minute walk, each way, from a worker's workstation.

247.     Although Amazon has provided some additional hand sanitizing stations for workers, the stations are not stocked frequently enough and supplies often run out.

248.     For most workers, the only place that they can wash their hands is the bathroom, which could mean 15 minutes or more of TOT and a significant decrease in their rate.

249.     If the bathroom is already occupied when a worker arrives, waiting longer for the bathroom to be vacated, as social distancing guidelines recommend, results in even more TOT and a further decrease in their rate.

250.     Even when Amazon provides wipes to clean workstations, some workers, including the Plaintiffs employed by Amazon, fear taking the time to clean their stations for fear it will result in a writeup for TOT or rate issues.

251.     Amazon has not provided workers with additional time between breaks to wash their hands or clean their workstations while they are working.

252.     In fact, Amazon recently changed the break schedule so that instead of receiving two 20-minute breaks in addition to their lunch break each shift, workers receive one 35-minute break in addition to their lunch break each shift.

253.    As a result, bathroom lines and break rooms are more crowded during the break time.

254.    Prior to the pandemic, managers regularly told workers that they should use the bathroom during their break time so that their rates and TOT would not be affected.

255.    The rush to avoid TOT and maintain Amazon's rates while working also impedes social distancing.

256.    Workers often find themselves rushing through the facility, which makes it difficult for them to spread out in hallways or, when they are able to use the bathroom or are required to access other cramped spaces, to allow other workers to leave before they enter.

257.    These time constraints exert particularly harsh pressures over workers now because Amazon has hired a substantial number of temporary "seasonal" workers to staff its JFK8 warehouse during the pandemic.

258.    These temporary "seasonal" workers, many of whom have been laid off from other jobs, are helping Amazon to meet increased demands cheaply and filling in for dozens of workers who have contracted COVID-19 while working at Amazon or who are in quarantine as a result of exposure to coworkers who have contracted COVID-19.

259.    These temporary "seasonal" workers have even less familiarity with Amazon requirements regarding TOT and rate but are just as fearful of losing their jobs.

260.    Workers hired after July 13, 2020 may not be aware that Amazon has suspended productivity requirements during the COVID-19 pandemic.

261.    These temporary "seasonal" workers are thus more likely to rush through tasks and when moving through the facility and less likely to take even modest time away from their work to wash their hands.

262.     Upon information and belief, workers do not have a mechanism at their disposal to automatically indicate time spent cleaning their workstations.

263.     Process Assistants, who have the authority to waive TOT for certain reasons, do not have any way to waive TOT for employees taking extra time to clean their workstations , even if workers are cleaning their workstations to protect themselves from the spread of COVID-19 in the facility.

264.     Upon information and belief, workers must speak to a higher-level manager to ensure that time spent cleaning their workstations does not count against them for TOT purposes.

265.     Upon information and belief, Amazon is not deep cleaning on a daily basis workstations or computers that employees use.

266.     Plaintiff Palmer has not observed anyone from the cleaning crew sanitizing workstations during breaks or lunch, apart from some basic sweeping, mopping or collecting of trash.

267.     Plaintiff Palmer saw a poster in the facility containing a "Daily Deep Cleaning Cadence" schedule for the JFK8 facility. The poster instructed "please exclude spraying stations and electrical components."

268.     Plaintiffs Palmer's and Bernard's workstations typically appear dirty when they begin their shifts.

269.     Because Amazon failed to effectively communicate its policy suspending TOT and rate requirements, Plaintiff Palmer has needed to spend time cleaning his station before he started working.

270.     Until July 13, 2020, Palmer believed that time spent cleaning his workstation counted as TOT and was negatively affecting his rate, so he believed that he needed to be extra

diligent about working quickly and constantly throughout the rest of his shift and was therefore less willing to take additional time to clean his station or to leave his station to wash his hands.

271.    The vast majority of the workspace at JFK8 is not air conditioned.

272.    As summer temperatures in New York City regularly exceed 85 degrees, JFK8 has become unbearably hot.

273.    Workers at JFK8 regularly become dizzy or faint from the heat.

274.    Only two of the breakrooms in JFK8 are air conditioned.

275.    Amazon has encouraged workers to make use of the air-conditioned break rooms.

276.    As a result, workers seeking a respite from the heat crowd into these break rooms during their scheduled break time, impeding social distancing.

**Amazon Takes Responsibility for Contact Tracing, But Fails to Comply with the Basic Requirements of Contact Tracing**

277.    Amazon informs workers that it engages in contact tracing.

278.    Amazon even suggests that its own contact tracing—as opposed to the judgment of the local public health offices—should determine whether a worker is eligible for COVID leave.

279.    Amazon purports to perform contact tracing through and with the aid of its immense surveillance system, which uses cameras and other technology to track workers' locations during workdays.

280.    Amazon has told workers that its contact tracing consists entirely of reviewing surveillance footage to monitor the workplace contacts of workers diagnosed with COVID-19.

281.    Amazon claims it uses this information—and only this information—to identify workers who came into close contact with an infected worker during the final shift that the worker was in the facility before leaving due to infection.

282.    Amazon does not interview infected workers to identify colleagues they believe may have been exposed to the virus at JFK8.

283.    Amazon discourages workers who have tested positive for COVID-19 from informing coworkers they have tested positive and that others may be at risk.

284.    These practices fall short of, and in some cases are directly contrary to, proper protocols for contact tracing.

285.    According to CDC guidance, the entity performing contact tracing should inform all people who have come into close contact with an infected person within the 48 hours before the infected person experienced symptoms.

286.    According to New York requirements, employers must cooperate with local health departments if someone at the facility is diagnosed with COVID-19 by providing a list of all workers and visitors who entered the facility within 48 hours of the time the infected person was diagnosed or began experiencing symptoms, whichever was earlier, so that proper contact tracing can be performed.

287.    Instead of cooperating fully with local health authorities, however, Amazon appears to be attempting to perform contact tracing on its own.

288.    A health advisory published by the New York State Health Department on March 31, 2020, mandated that essential workers who had been exposed to a person with a confirmed or suspected case of COVID-19 would only be permitted to continue working if they remained asymptomatic, quarantined while at home, underwent symptom checks upon entering the workplace each day, and self-monitored for symptoms (including checking their temperature

every 12 hours) while at home.[9]

289.    Amazon does not ask workers who have reported exposure to an individual with COVID-19 whether they have any symptoms.

290.    Amazon also does not instruct these workers on how to monitor their health at home, to quarantine when not at work, or to seek medical advice.

291.    In an effort to maintain labor force levels, even when many workers are or may be infected with COVID-19, Amazon is not performing contact tracing consistently with CDC and/or New York State guidance.

292.    For example, after Plaintiff Barbara Chandler received the results of her positive test for COVID-19 on March 26, 2020, she immediately informed Amazon of her diagnosis.

293.    Although HR manager Tyler Grabowski called Chandler to request documentation of her positive test, he did not ask her about when she began experiencing symptoms, or whether she had been in close contact with others in the facility.

294.    No one from Amazon ever followed up with Chandler about when she experienced symptoms, whether she had contact with others, or to gather any other information for contact tracing purposes.

295.    Bernard began experiencing symptoms of COVID-19 at work at JFK8 on March 25, 2020.

296.    Bernard did not go to work after she began experiencing COVID-19 symptoms.

297.    Instead, Bernard used the unlimited UPT that was in effect at the time to stay home while she sought testing. During this time, she continued to experience COVID-19

---

[9]

https://coronavirus.health.ny.gov/system/files/documents/2020/04/doh_covid19_essentialpersonnelreturntowork_rev2_033120.pdf.

symptoms.

298.    Bernard used Amazon's A to Z app to log her absences using UPT.

299.    In the message field of the A to Z app, Bernard indicated that she was absent from work due to COVID-19 symptoms. No one from Amazon followed up with her about her symptoms.

300.    On April 9, even though she had been logging her absences, including the fact that she was self-quarantining, in the A to Z app, Bernard received an email saying that she was at risk of being fired for "job abandonment."

301.    Bernard was finally able to take a COVID-19 test on April 8, 2020 and received her positive test result on April 13, 2020.

302.    Bernard promptly communicated her diagnosis to Amazon by sending a message to HR manager Tyler Grabowski using the Chime app.

303.    Grabowski interviewed Bernard on April 13, 2020.

304.    During the interview, Bernard explained that she began feeling sick while at work on March 25, and that she believed she had contracted the virus at work after being in close contact with co-workers who had COVID-19.

305.    Although Bernard told Grabowski that she had been in close contact with people while at work, Grabowski did not ask her to provide the names of those individuals.

306.    The call with Grabowski lasted 4 minutes and 40 seconds.

307.    This call was the only conversation Bernard had with anyone at Amazon about contact tracing.

308.    No one from Amazon followed up with Bernard to ask her about individuals with whom she had close contact, or to put her in touch with public health authorities for contact

tracing purposes.

309.   In May 2020, when Plaintiff Benita Rouse learned that a colleague with whom she worked closely had tested positive with COVID-19, she struggled to get an authoritative answer as to whether she should quarantine as a result of her close contact with her sick coworker.

310.   When Rouse finally reached a friend's day shift manager via "Chime," Amazon's in-house messaging system, she was told that she should be patient because "contact tracing takes some time."

311.   Then, five minutes later, the manager told Rouse that she could return to work that day.  A few hours later, the same manager asked Rouse to inform another co-worker that they could return to work.

312.   No one from Amazon asked Rouse if she had experienced any symptoms of COVID-19 before authorizing her to return to work.

313.   No one from Amazon affirmatively reached out to Rouse to advise her that she might have been exposed to COVID-19, despite her close contact with an infected co-worker.

**Amazon Does Not Properly Sanitize High-Touch Services or Clean Areas that Have Been Touched by Someone Who Has Been Diagnosed with the Virus**

314.   Sanitizing and cleaning are especially important in a facility like JFK8, where thousands of workers may be touching the same surfaces on any given day and where many workers have already contracted COVID-19.

315.   New York state requires that businesses conduct regular cleaning and disinfection of the facility, and more frequent cleaning and disinfection for high risk areas used by many individuals and for frequently touched surfaces. Cleaning and disinfection must be rigorous and ongoing and should occur at least after each shift, daily, or more frequently as needed.

316.    New York state also requires that businesses like Amazon provide appropriate cleaning and disinfection supplies for shared and frequently touched surfaces, and encourage employees to use these supplies, following manufacturer's instructions, before and after use of these surfaces, followed by hand hygiene.

317.    New York state requires businesses, like Amazon, to provide for the cleaning and disinfection of exposed areas in the event of a positive case of COVID-19.

318.    Such cleaning and disinfection must include, at minimum, all heavy transit areas and high-touch surfaces, including shared tools, machines, workspaces, vehicles, and railings.

319.    The CDC currently recommends that businesses routinely disinfect all surfaces.

320.    For surfaces that have been touched by someone who has contracted COVID-19, the CDC recommends that businesses prevent others from touching those surfaces for at least 24 hours before thoroughly disinfecting the surfaces with an EPA-approved disinfecting agent.

321.    Amazon sometimes provides workers at the JFK8 facility with access to tissues and disinfectant but does not provide those workers with extra time to clean surfaces.

322.    Because of their strict work-pace requirements, adjustments to which have not been effectively communicated during the pandemic, workers may not have sufficient time to clean their own workspaces.

323.    Amazon does not provide a consistent or reliable supply of hand sanitizer or disinfecting wipes. Workers at the JFK8 facility have at times even resorted to searching the area where damaged products are stored to try to find cleaning supplies.

324.    Additionally, although dozens of workers at the facility have already contracted COVID-19, Amazon has not prevented other workers from touching any surfaces touched by someone who has contracted the virus within the prior 24 hours and has not made efforts to

adequately sanitize those surfaces.

## COUNT I: PUBLIC NUISANCE AND DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

### (BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)

325.    Amazon's failure to comply with minimum basic health and safety standards at the JFK8 facility, including New York Forward minimum requirements, CDC guidelines, and other minimum public health standards necessary to stop the spread of COVID-19, is causing, or is reasonably certain to cause, community spread of the disease.

326.    Amazon's specific failures include:

    a.    Failing to sufficiently stagger breaks to promote social distancing in violation of NY Forward guidance as described in paragraph 70(d).

    b.    Failing to clean and sanitize commonly used workspaces and tools between shifts in violation of NY Forward guidance described in paragraph 70(e).

    c.    Failing to make available sufficient opportunities for workers to engage in personal hygiene like handwashing in violation of NY Forward guidance described in paragraph 70(c).

    d.    Failing to allocate time and adequate supplies for workers to clean and sanitize their own workstations in violation of NY Forward guidance described in paragraph 70(g).

    e.    Failing to cooperate with public health officials in conducting robust contact tracing and providing relevant information to all exposed workplace contacts in violation of NY Forward guidance described in paragraph 70(i) and CDC guidance described in paragraph 83(f).

f.      Failing to implement flexible leave policies that disincentivize workers to come into work when they are or may be sick, and failing to clearly communicate these leave policies to all affected workers, in violation of NY Forward guidance described in paragraph 70(j) and CDC guidance described in paragraph 83(a) and 83(b).

g.      Failing to comply with New York's COVID leave law by failing to make such leave promptly available without requiring documentation, encouraging workers to attend work even when they should or may be eligible for such leave, failing to pay workers promptly for such leave, and failing to pay workers their complete wages for such leave.

327.    This community spread is not, has not been, and will not be limited to JFK8. Infected workers will go home to interact with their families and with other members of the public as they undertake their day-to-day activities, like grocery shopping and using public transportation.

328.    Increased community spread at JFK8 will cause increased community spread within the five boroughs of New York City, the State of New York, the State of New Jersey, and potentially other states as well.

329.    This community spread will result in disease and possibly death. It will also stress healthcare resources and cause financial harm.

330.    Amazon's current policies and practices constitute a public nuisance because they unreasonably interfere with the common public right to public health.

331.    This public nuisance causes special harm to Plaintiffs Chandler, Palmer, Bernard and Benita Rouse (the "Employee Plaintiffs") because they are directly exposed to the dangerous

48

working conditions at JFK8 caused by Amazon's policies and failures to meet its minimum duties to its employees.

332.    The Employee Plaintiffs also experience special harm flowing from their fear of contracting COVID-19 and infecting a family member. The Employee Plaintiffs experience emotional distress flowing from their knowledge that their work—which they cannot do remotely and which they need to sustain their families—may expose their loved ones to a deadly virus.

333.    This public nuisance causes special harm to Plaintiffs Pellott-Chandler, Mesidor and Alexander Rouse (the "Family Plaintiffs") because sharing homes with the Employee Plaintiffs heightens their risk of contracting the virus and creates a different kind of risk than the public generally experiences because the Family Plaintiffs are at substantial risk of contracting COVID-19, even if they remain at home and comply with all social distancing and other public health directives.

334.    This risk is different in degree and kind from the public generally. Whereas the public generally can protect themselves from the virus by staying home, the Family Plaintiffs are at risk inside their own homes because of the exposure Amazon causes to Employee Plaintiffs. Furthermore, unlike others who may be invited into the home, for example to provide repairs, the Family Plaintiffs are less able to protect themselves from the spread of disease.

335.    Amazon's public nuisance also causes special harm to the Family Plaintiffs because they experience anxiety about contracting COVID-19 as a result of their family members' work at JFK8.

336.    Plaintiffs therefore request a declaration that Amazon's policies and practices at JFK8 constitute a public nuisance and request injunctive relief to abate the nuisance.

**COUNT II: BREACH OF DUTY TO PROTECT HEALTH AND SAFETY OF EMPLOYEES AS REQUIRED BY NEW YORK LABOR LAW § 200 AND DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201**

**(BY EMPLOYEE PLAINTIFFS AGAINST ALL DEFENDANTS)**

337.     Pursuant to New York Labor Law § 200, Amazon must provide reasonable and adequate protection to the lives, health and safety of all persons employed at or lawfully frequenting JFK8.

338.     By failing to adopt and adhere to New York's minimum requirements and New York's COVID leave law, as described above, Amazon has breached this duty.

339.     Employee Plaintiffs and other workers at JFK8 have already been harmed as a result of this breach, including emotional harm and in some cases pecuniary harm and physical harm associated with the COVID-19 infection.

340.     The Employee Plaintiffs are also likely to experience future harm if Amazon does not immediately satisfy its duty to protect employees' health and safety as a matter of New York law.

341.     The Employee Plaintiffs request a declaration that these workplace safety duties are being breached and request injunctive relief to ameliorate the breach.

**COUNT III:  FAILURE TO TIMELY PAY EARNED WAGES UNDER N.Y. LAB. LAW § 191**
**(BY PLAINTIFFS DEASAHNI BERNARD AND BARBARA CHANDLER AND THE RULE 23 DAMAGES CLASS AGAINST ALL DEFENDANTS)**

342.     Plaintiff Bernard, Plaintiff Chandler, and members of the Damages Class are employees of Defendants.

343.     Defendants employ Bernard, Chandler, and members of the Damages Class.

344.     Bernard, Chandler, and members of the Damages Class are engaged in manual and/or clerical labor pursuant to N.Y. Lab. Law § 191.

345.    Pursuant to New York law, COVID-19 Leave is earned wages that must be paid out as wages during the next pay period.

346.    Defendants are employers with one hundred or more employees and therefore are required to provide all employees with at least fourteen days of paid sick leave to cover a period of a mandatory or precautionary order of quarantine or isolation.

347.    Defendants are required to pay the amount of wages that an employee would have otherwise received over the period of a mandatory or precautionary order of quarantine or isolation based upon the amount of time that employee was scheduled to work.

348.    Bernard, Chandler, and members of the Damages class were Amazon employees actively scheduled to work at the time that they each tested positive for COVID-19.

349.    Defendants failed to pay Bernard, Chandler, and members of the Damages Class their earned wages for COVID-19 paid leave on a timely basis.

350.    Defendants willfully failed to pay Bernard, Chandler, and members of the Damages Class their earned wages for COVID-19 leave pay at their regular pay rate.

351.    Defendants willfully failed to pay Bernard, Chandler, and members of the Damages Class their earned wages for COVID-19 leave pay for the duration of their mandatory or precautionary quarantine or isolation.

352.    Due to Defendants' violations of the New York Labor Law, Plaintiffs and members of the Damages Class are entitled to recover from Defendants their unpaid wages, liquidated damages, prejudgment interest, reasonable attorneys' fees and costs of the action, in an amount to be determined at trial, pursuant to New York Labor Law § 198.

**COUNT IV:** **INJUNCTION AGAINST FUTURE FAILURE TO TIMELY PAY EARNED WAGES UNDER N.Y. LAB. LAW § 191**
**(BY EMPLOYEE PLAINTIFFS AND THE RULE 23 INJUNCTION CLASS AGAINST ALL DEFENDANTS)**

353.    Plaintiffs and members of the Injunction Class are employees of Defendants.

354.    Defendants employ Plaintiffs and members of the Injunction Class.

355.    Plaintiffs and members of the Injunction class are engaged in manual and/or clerical labor pursuant to N.Y. Lab. Law § 191.

356.    Pursuant to New York law, COVID-19 leave is earned wages that must be paid out as wages during the next pay period.

357.    Defendants are employers with one hundred or more employees and therefore are required to provide all employees with at least fourteen days of paid sick leave to cover a period of a mandatory or precautionary order of quarantine or isolation.

358.    Defendants are required to pay the amount of wages that an employee would have otherwise received over the period of a mandatory or precautionary order of quarantine or isolation based upon the amount of time that employee was scheduled to work.

359.    Because the Employee Plaintiffs and members of the Injunction Class are subject to the same pay policies as Plaintiffs Bernard and Chandler, Plaintiffs are concerned that if they become eligible for COVID-19 paid leave, Defendants will fail to pay them their earned wages for COVID-19 paid leave on a timely basis.

360.    Because all Employee Plaintiffs and members of the Injunction Class are subject to the same pay policies as Plaintiffs Bernard and Chandler, Plaintiffs are concerned that if they become eligible for COVID-19 paid leave, Defendants will fail to pay them their earned wages for COVID-19 paid leave at their regular pay rate.

361.    Because all Employee Plaintiffs and members of the Injunction class are subject
to the same pay policies as Plaintiffs Bernard and Chandler, Plaintiffs are concerned that if they
become eligible for COVID-19 leave pay, Defendants will fail to pay them their earned wages
for COVID-19 leave pay for the full duration of their period of mandatory or precautionary
quarantine or isolation.

## PLAINTIFFS DO NOT DEMAND A JURY TRIAL

## PRAYER FOR RELIEF

362.    Plaintiffs respectfully request an Order from this Court:

a.    Entering judgment for Plaintiffs and against Defendants;

b.    Declaring that Amazon's failure to implement appropriate worker
protections during the COVID-19 crisis constitutes a public nuisance under New York law and a
violation of the right to a safe workplace under New York law.

c.    Entering preliminary and final injunctive relief to protect the workers and
community from transmission, including but not limited to:

i.    Communicate clearly with workers consistent with applicable NY
Forward guidance described in paragraph 70(j) that if they are
experiencing symptoms of COVID-19 or otherwise may be subject to
a quarantine or isolation, they should consult a physician or public
health professional and not attend work, that they will not face any
adverse employment consequences for taking COVID leave, and that
they will be paid on their next paycheck for taking COVID leave;

ii.    Continue to communicate to workers, in writing, and communicate to
all newly onboarded workers in writing, that Amazon has suspended
rate requirements as a result of the COVID-19 pandemic, as required

by applicable New York Forward guidance described in paragraph 70(j);

iii.   Continue the existing suspension of rate requirements and refrain from counting handwashing and bathroom breaks against TOT requirements for as long as the minimum requirements of New York Forward remain in effect;

iv.   Provide workers with adequate time and tools to clean and disinfect their work stations, as required by applicable New York Forward guidance described in paragraph 70(g), and communicate to all newly onboarded workers in writing that time spent on these tasks will not count against their TOT;

v.   Ensure that workers have access to air-conditioned break rooms in which they can maintain social distancing, as required by applicable New York Forward guidance described in paragraph 70(d);

vi.   Pay workers for at least 14 days of COVID leave, and more if they were ill or quarantined due to COVID-19 for more than 14 days, on their next paycheck, at the rate they would have earned had they been working, as required by New York's COVID-19 paid leave law;

vii.   Either a) delegate all contact tracing responsibilities to the local health department or another independent,  trained professional without relying on its own surveillance footage to determine which workers have been in contact with one another, or if Amazon continues to perform contact tracing itself, then b) conform those efforts to New

York and CDC guidance for contact tracing, such as interviewing the infected individual about others they have been in touch with, accounting for their activities in the 48 hours before diagnosis or onset of symptoms, and following up with all identified contacts of the infected individual to inform them of their exposure and inquire if they are experiencing symptoms; and

viii. Consistent with CDC guidance, allow workers immediate access to all 48 hours of PTO, even if they have not yet accrued all 48 hours based on their amount of time working at Amazon, for the remainder of 2020.

d. Damages including compensatory damages, statutory penalties, and other available relief for Plaintiffs Barbara Chandler and Deasahni Bernard and the Damages Class arising from unpaid wages and late payment of wages resulting from Amazon's failure to timely pay the full amount of New York COVID-19 leave pay.

e. Awarding such other relief as this Court may deem just and proper.

Dated: July 28, 2020                        By: /s/ Juno Turner
New York, NY

                                            Juno Turner
                                            David H. Seligman*
                                            Valerie Collins*
                                            Towards Justice
                                            1410 High Street, Suite 300
                                            Denver, CO 80218
                                            Telephone: (720) 441-2236
                                            juno@towardsjustice.org
                                            david@towardsjustice.org
                                            valerie@towardsjustice.org

Sienna Fontaine
Elizabeth Jordan
Frank Rankin Kearl
Make The Road New York
92-10 Roosevelt Avenue
Jackson Heights, NY 11372
Telephone: (718) 565-8500 x4425
elizabeth.joynesjordan@maketheroadny.org
frank.kearl@maketheroadny.org
sienna.fontaine@maketheroadny.org

Karla Gilbride*
Stephanie K. Glaberson*
Public Justice
1620 L. St, NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
kgilbride@publicjustice.net
sglaberson@publicjustice.net

Beth Terrell*
Toby Marshall*
Blythe Chandler*
Amanda Steiner
Erika Nusser*
Terrell Marshall Law Group PLLC
936 N. 34th Street, Suite 300
Seattle, WA 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
bterrell@terrellmarshall.com
tmarshall@terrellmarshall.com
bchandler@terrellmarshall.com
asteiner@terrellmarshall.com
enusser@terrellmarshall.com

Attorneys for Plaintiffs

*(admitted *pro hac vice*)